PAUL, HASTINGS, JANOFSKY & WALKER LLP
Robert L. Sherman (RS 5520)
75 East 55th Street
New York, NY 10022
Telephone: (212) 318-6000
Facsimile: (212) 318-6847

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



JUDGE McKENNA

---

DIRECT MARKETING EDUCATIONAL
FOUNDATION, INC.

                    Plaintiff,

    - against -

JOHN WILEY & SONS, INC.,

                    Defendant.

---

08 CV 1464

**COMPLAINT**

FEB 11 2008
U.S.D.C. S.D. N.Y.
CASHIERS

---

      Plaintiff Direct Marketing Educational Foundation ("DMEF"), by its attorneys, Paul,

Hastings, Janofsky & Walker LLP, as and for its complaint against defendant John Wiley & Sons,

Inc. ("Wiley") alleges, on personal knowledge as to itself and upon information and belief as to all

other matters, as follows:

### Nature of the Action

    1.     This is an action to prevent the irreparable damage that would arise from Wiley's

imminent unauthorized use and infringement of DMEF's trademark JOURNAL OF

INTERACTIVE MARKETING® (the "Trademark"), and to resolve an actual controversy that

exists between the parties regarding DMEF's right to continue using the volume and issue

numbering associated with the journal and the assigned International Standard Serial Numbers

(ISSNs) for the print and online formats of the journal under the Trademark.  DMEF seeks

preliminary and permanent injunctive relief pursuant to Section 34(a) of the Lanham Act, 15 U.S.C.

§ 1116(a), based on the following claims: (1) trademark infringement under Section 32 of the

Lanham Act, 15 U.S.C. § 1114; (2) false designation of origin and false description and

representation under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); and (3) common law

infringement, unfair competition, and deceptive practices.  Plaintiff also seeks a declaratory

judgment pursuant to 28 U.S.C. §§ 2201 *et seq.* stating that the rights to the volume and issue

numbering used in conjunction with a journal title and the ISSNs are inseparable from the rights in

that title, and that DMEF may continue the volume and issue numbering sequence associated with

the ISSNs when it resumes publication of the journal.

## The Parties

2.      DMEF is a not-for-profit corporation under Section 501(c)(3) of the Internal

Revenue Code and organized under the laws of Illinois, with a place of business at 1120 Avenue of

the Americas, New York, NY 10036.

3.      Upon information and belief, Wiley is a corporation organized under the laws of

New York, with corporate headquarters at 111 River Street, Hoboken, NJ 07030.

## Jurisdiction and Venue

4.      This action arises under the federal Trademark Act of 1946, 15 U.S.C. §§ 1051 *et seq.*

and under the laws of the State of New York pursuant to the parties' choice of law provisions in the

contract that licenses Wiley to use DMEF's Trademark.

5.      This Court has jurisdiction over this action pursuant to 15 U.S.C. § 1121(a) and 28

U.S.C. §§ 1331 and 1338 and has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.  This

Court also has jurisdiction pursuant to 28 U.S.C. § 1335 in that the parties are citizens of different

states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6.     This Court has personal jurisdiction over Wiley because, upon information and belief, Wiley is incorporated in the State of New York, and because, upon further information and belief, Wiley does and transacts business in this district, and has purposely targeted its activities, among other places, to this district.

7.     Venue in this district is proper pursuant to 28 U.S.C. §§ 1391(b) and (c).

### Facts Common to All Claims

8.     DMEF owns an incontestable, valid and subsisting federal trademark registration for the mark JOURNAL OF INTERACTIVE MARKETING (Registration No. 2,177,647) for use in connection with journals published quarterly containing articles focused on academic research in the areas of direct marketing and interactive marketing.  A copy of the registration, printed from the Web site of the United States Patent and Trademark Office found at www.uspto.gov, is attached hereto as Exhibit A.

9.     In 1985, DMEF announced plans to create an academic journal to publish leading research and scholarship in the field of direct marketing.  In the ensuing year, DMEF established and located its journal at the Medill School of Journalism at Northwestern University ("Medill"), formed an Editorial Review Board, sought manuscripts, set up an editorial office, named an editor, and hired a managing editor.  The first issue of DMEF's *Journal of Direct Marketing* (the "JDM"), identified by ISSN 0892-0591, was published in February 1987 by Medill in cooperation with DMEF.

10.     In 1988, DMEF sought a publisher to assume responsibility for the business aspects of the JDM, namely, production, circulation, and marketing, while DMEF through its relationship with Medill, the DMEF-appointed editors, and the Editorial Review Board would retain responsibility for the editorial content of the JDM.

11.    DMEF and Wiley entered into an agreement (the "Agreement") in August 1988 for the publication and distribution of the JDM by Wiley in conjunction with DMEF, to be billed as the official journal of DMEF.  The Agreement (as amended in 1992) is attached as Exhibit B.

12.    In 1998, DMEF changed the title of its journal to the *Journal of Interactive Marketing* (the "JIM").  Along with the change in title, the ISSN changed to 1094-9968 for print publication of the JIM; the electronic version of the JIM has been assigned ISSN 1520-6653.  DMEF and Wiley published the *Journal of Interactive Marketing*, Volume 12, No. 1 for the Winter 1998 publication.  The most recent issue was the *Journal of Interactive Marketing*, Volume 21, No. 4, published on November 15, 2007.

13.    Volume and issue numbers help identify serial publications originating from a single journal.  In combination with the journal title, the ISSN and the volume and issue numbers create a unique identifier for each publication under a single title, (*e.g.*, "Journal of Direct Marketing (ISSN 0892-0591) – Volume 11, No. 4," "Journal of Interactive Marketing (ISSN 1094-9968) – Volume 12, No. 1," "Journal of Interactive Marketing (Print ISSN 1094-9968; Online ISSN 1520-6653) – Volume 14, No. 1").

14.    The "Journal" referred to in the Agreement between the parties was known as the *Journal of Direct Marketing* from 1988-1997 and as the *Journal of Interactive Marketing* from 1998 to the present (collectively, the "Journal").

15.    Under the plain terms of the Agreement, DMEF owns the trademark in the name of the Journal, and licenses Wiley to use that trademark for the term of the Agreement and for any extensions thereof.  *See* Exhibit B, § 1.

16.    The Agreement provides Wiley with a license to use DMEF's Trademark as the title of its publication for a transitional period of one year following non-renewal by either party.  By the

end of the year following termination, Wiley must change the name of its publication if it continues publishing (Exhibit B, §§ 15, 16).

17.    The Agreement expressly provides that DMEF shall be responsible for editorial control and content and that Wiley shall be responsible for non-editorial aspects.  Among other things, the Agreement provides:

a.  DMEF shall furnish or cause to be furnished to Wiley manuscripts to publish in each issue (Exhibit B, § 3).

b.  DMEF appoints the Editor, with the concurrence of Wiley, and DMEF has the right to terminate an appointee as Editor after consultation with Wiley, and to appoint a successor editor (Exhibit B, § 4).

c.  DMEF provides all support for the editorial office and sets general editorial policy, with the concurrence of Wiley (Exhibit B, § 4).

d.  The Editor(s), appointed by DMEF with Wiley's concurrence, selects members of the Editorial Review Board and is "responsible for all editorial functions of the Journal receiving such guidance from DMEF as he and DMEF shall agree." Editorial responsibilities include soliciting manuscripts, evaluating manuscripts, obtaining peer review, selecting contributions, and approving copy (Exhibit B, § 4).

e.  Wiley "shall be responsible for the non-editorial affairs," including, among other things, copyediting, production, pricing, sale, distribution, and marketing.  In addition, Wiley is responsible for developing broad policies regarding paid advertisements, in consultation with and subject to the approval of DMEF and the Editor (Exhibit B, §§ 6, 7).

18.    By amendment entered into in the fourth quarter of 1992, the parties established that the initial term of the Agreement would end December 31, 2007, and that the Agreement would automatically renew unless either party provided written notice of non-renewal at least ten (10) months prior to the expiration of the term (Exhibit B, Amendment to Agreement).

19.    Throughout the term of the Agreement, DMEF and its appointed editors, with recommendations from the Editorial Review Board, remained responsible for editorial content and appointing editors in consultation with Wiley, and was the sole entity responsible for funding the staff and all activities related to the editorial office.

20.    Over the past twenty years, DMEF, its appointed editors, and the Editorial Review Board have invested significantly in developing the Journal's reputation as a high quality academic publication featuring rigorous cutting-edge research and scholarship.

21.    Upon information and belief, librarians, professors, researchers, professionals, and others familiar with academic publishing judge the quality and reputation of social science journals by the Social Science Citation Index (the "SSCI"), as measured and reported by ThomsonScientific Journal Citation Reports. The SSCI measures a journal's "impact factor" based on the number of citations made to articles published in the journal in the prior two years.

22.    In 2006, the JIM's "impact factor" rating was 1.457, which makes it one of the top-ranked academic journals in the marketing and advertising fields.

23.    A journal's "impact factor" reflects the strength of the editorial selections. It suggests the quality, timeliness, and relevance of content solicited and chosen by a journal's editor(s) over time, and it is heavily considered among worldwide academic institutions when considering the advancement and tenure of professors.

24.    Upon information and belief, readers, contributors, and other "consumers" of academic journals understand that such journals are published under the quality control of editors

LEGAL_US_E # 78085304.3

and an editorial review board that is responsible for the journal's content, substance, and intellectual coherence, even if a publisher has control over business decisions such as pricing, marketing, and distribution.

25.     The Journal has always been published as the official journal of DMEF, and is closely associated with DMEF in the minds of its subscribers, readers, and the direct / interactive marketing community, including academics and professionals alike.  Upon information and belief, readers, contributors, and other "consumers" of the JIM understand that it is published under the editorial control of DMEF, its appointed editors, and the Editorial Review Board, and that Wiley, as the publisher, at most has control over non-editorial decisions.

26.     Upon information and belief, throughout the term of the Agreement, Wiley attempted but failed to secure a signed contract with the co-editors of the Journal, which would bind the editors to Wiley apart from Wiley's Agreement with DMEF.

27.     In February 2007, in accordance with the terms of the Agreement, DMEF provided written notice of non-renewal to Wiley.  At or about that time, DMEF notified Wiley that DMEF would initiate a request for proposal (RFP) process with a number of publishers, including Wiley, to determine which would be the publisher for future publication of the JIM.

28.     In June 2007, DMEF received three proposals in response to its RFP.  Near the end of July 2007, DMEF and a different publisher executed a new publishing contract for the JIM, effective as of January 1, 2008.  In August 2007, DMEF issued a press release announcing that it had entered into a new publishing agreement with a different publisher.

29.     On September 6, 2007, Wiley sent DMEF a letter in response to the August 2007 press release.  In its letter, Wiley stated its intent to continue publishing a journal of interactive marketing, and claimed that "Wiley is the sole and exclusive owner of the journal, except for the

journal's name...." In subsequent discussions between DMEF and Wiley, Wiley has agreed that DMEF and Wiley co-own the copyright in all material published during the term of the Agreement.

30.     Since September 2007, DMEF has attempted to resolve its differences with Wiley including, among other things, differences over the use of the name of the JIM, the right to use the volume and issue numbering sequence associated with the title *Journal of Interactive Marketing* and the ISSNs, the right to control the quality of content published under the title *Journal of Interactive Marketing* in the year following termination, the right to solicit "renewals," and each party's right to promote its journal as the "continuation" of the JIM.

31.     In subsequent discussions with Wiley, DMEF has repeatedly articulated concerns about Wiley's lack of editorial experience and lack of expertise in soliciting and selecting high quality relevant content for the JIM; the need to maintain the JIM's consistent high quality during the year following termination; and DMEF's right and obligation to control the quality of the JIM during that period, in order to protect the reputation and goodwill of the JIM and to preserve the source-identifying and quality-assurance functions of DMEF's Trademark.

32.     Discussions to address the disagreements between the parties included a proposal that DMEF, its appointed editors, and the Editorial Review Board provide editorial content to Wiley to publish in 2008, in order to assure DMEF's quality control over the content published under its Trademark. However, the parties were not able to resolve the other matters in dispute at that time and, as a result, did not reach agreement on DMEF's proposal regarding its providing content in 2008.

33.     In or about November 2007, without notice to DMEF, Wiley changed the process for submissions to the JIM, instructing authors to submit manuscripts directly to Wiley rather than to its prior contact, the JIM managing editor, a member of the DMEF staff. Upon information and belief, Wiley did not inform authors that their manuscripts would be reviewed by person(s) other

than the members of the Editorial Review Board associated with the JIM title, nor that the current editors and the Editorial Review Board would not be involved in selecting the editorial content for Wiley's journal.

34.     On or about January 3, 2008, counsel for DMEF contacted Wiley's in-house counsel and proposed extending the terms of the Agreement through 2008, but without renewal or a transition year, in order to enable DMEF to exercise the necessary control over content and thereby ensure the integrity and quality of the publication during that period, consistent with the obligations and rights of a trademark owner/licensor.

35.     In the conversation that occurred on or about January 3, 2008, in-house counsel for Wiley rejected DMEF's proposal to extend the terms of the Agreement and to have DMEF, its appointed editors, and the Editorial Review Board participate in the selection of content for the JIM. He informed counsel for DMEF that Wiley intended to publish two "Best of" issues of the JIM in the first two quarters of 2008.  Such "Best of" issues would consist of articles selected by Wiley from articles published in the JIM in the previous ten (10) years.

36.     Because the SSCI's "impact factor" measures the number of citations to articles in a journal, the re-publication in a "Best of" compilation of previously published material -- which would be cited in its original form -- can negatively affect an academic journal's "impact factor."

37.     The publication of two consecutive "Best of" issues of a quarterly academic journal can significantly diminish the journal's "impact factor" as well as damage its reputation for being able to attract, solicit, select, and publish new leading-edge research in the field.

38.     In addition, even when choosing among previously published material for a "Best of" issue, the involvement of an experienced and knowledgeable editorial staff is necessary, for example, to assess the continued relevance of the selected articles, to distinguish seminal articles

from those that have been disputed, and to ensure the selected articles relate to each other so that there is coherence to the issue as a whole.

39.     On or about January 14, 2008, the president of DMEF contacted Wiley to discuss DMEF's concerns over the quality of the content, to articulate DMEF's specific and significant concerns regarding Wiley's stated intent to publish two "Best of" issues without DMEF's editorial assistance, and to reassert DMEF's right and obligation to control the quality of any publication under its Trademark.

40.     In that conversation on or about January 14, 2008, Wiley rejected any effort by DMEF to control the content to be published under the JIM name during 2008.

41.     Wiley's stated plans deprive DMEF of its right to control the quality of goods offered in connection with its Trademark.

42.     Wiley's stated plans pose a risk of imminent harm because it intends to publish the first "Best of" issue of the JIM in the first quarter of 2008, and to publish the second "Best of" issue in the second quarter of 2008.

43.     Wiley's stated plans pose a risk of irreparable harm because they could cause lasting diminution in the quality of the product offered under DMEF's Trademark according to the academic publishing industry's generally accepted measure of "impact factor," and because they would jeopardize the reputation and goodwill that have inured to the JIM (including the JDM) and DMEF over the course of more than twenty years.

44.     DMEF has no adequate remedy at law.

45.     An actual controversy exists as to whether DMEF may continue the volume and issue numbering sequence associated with the JIM and its assigned ISSNs when it resumes publication of that title.

**Count One**

**Trademark Infringement under Section 32 of the Lanham Act**

46.    DMEF repeats and realleges paragraphs 1-45 as if fully set forth herein.

47.    Wiley's right to use DMEF's Trademark arises solely from the Agreement between the parties, and is limited to the scope of that Agreement and the license provided therein. Wiley has no independent right to use DMEF's Trademark.

48.    As provided by the parties' Agreement and as required by well-established tenets of trademark law, DMEF, as the trademark owner, has the obligation and the right to oversee and control the quality of the editorial content offered in connection with the Trademark.

49.    A licensee's right to use a trademark is subject at all times to the trademark owner's right to control quality, and depriving the trademark owner of the right to control quality constitutes unauthorized use.

50.    Wiley's right to publish under the Trademark, *Journal of Interactive Marketing,* is subject to DMEF's right to control the quality of the publication offered under that Trademark.

51.    Where the industry recognizes external indicia of quality and value, such as the "impact factor" measured by the SSCI, the trademark owner has the right to exert quality control, among other ways, in accordance with the criteria established by that index.

52.    When the goods and services in question are the publication of an academic journal, control over quality of the goods and services includes control over the solicitation, selection, and editing of the individual manuscripts to ensure that they represent current leading-edge research, and includes control over the coherent compilation of each issue of the journal.

53.    By depriving DMEF of its right to control quality, Wiley exceeds the scope of its license, and use of the Trademark in such circumstances is unauthorized use that infringes DMEF's rights in its Trademark.

- 11 -

54.    Wiley's intent to engage in unauthorized and infringing use of DMEF's Trademark by depriving DMEF of control over the quality of the publication would cause confusion, cause mistake, or deceive consumers of the JIM, who would incorrectly attribute the editorial quality of the JIM to DMEF, its appointed editors, and the Editorial Review Board.

55.    Wiley's intent to engage in unauthorized and infringing use of DMEF's Trademark by depriving DMEF of control over the quality of the publication would cause long-lasting damage to the reputation, goodwill, and value that DMEF has developed in its Trademark through significant investment of time, effort, and expertise over many years.

56.    Section 32 of the Lanham Act prohibits a person, without the consent of the registrant of a trademark, from using in commerce a reproduction, counterfeit, copy, or colorable imitation of a registered mark, *i.e.*, from making unauthorized use of a trademark, that is likely to cause confusion, or to cause mistake, or to deceive.  15 U.S.C. § 1114(1).

57.    Unless enjoined by this Court, Wiley's unauthorized and infringing use of DMEF's Trademark, which deprives DMEF of control over the quality of the publication, will cause irreparable harm, damage, and injury to DMEF, for which DMEF has no adequate remedy at law.

## Count Two

### False Designation of Origin, False Description, and False Representation under Section 43(a) of the Lanham Act

58.    DMEF repeats and realleges paragraphs 1 to 57 as if fully set forth herein.

59.    Wiley has a limited one-year license from DMEF to use DMEF's Trademark in connection with its publication during the year following termination.

60.    Wiley's intent to publish a journal under the DMEF's Trademark while depriving DMEF of control over the quality of the content falsely suggests to the public, including but not limited to academics, libraries, subscription agencies, and direct / interactive marketing professionals

- 12 -

worldwide, that the publication is subject to the level of editorial control previously exerted by DMEF, including the involvement of DMEF's appointed editors and the Editorial Review Board, in soliciting, selecting, and editing manuscripts, and/or falsely suggests to the public that DMEF endorses or sponsors the content included in the publication.

61.     Wiley's unauthorized use of DMEF's Trademark would thus constitute a false designation of origin and a false or misleading description or representation of fact which is likely to cause confusion, to cause mistake, or to deceive members of the public, who will erroneously believe that Wiley's publication is affiliated, connected, or associated with DMEF.

62.     Section 43(a) of the Lanham Act prohibits any false designation of origin, false or misleading description of fact, or false or misleading representation of fact which is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person.  15 U.S.C. § 1125(a).

63.     Unless enjoined by this Court, Wiley's intended unauthorized use of the Trademark will cause irreparable harm, damage, and injury to DMEF for which DMEF has no adequate remedy at law.

## Count Three

### Common Law Infringement, Unfair Competition, and Deceptive Practices

64.     DMEF repeats and realleges the allegations contained in paragraphs 1-63 as if fully set forth herein.

65.     Wiley's intended acts constitute infringement, unfair competition and deceptive practices under the statutory and/or common law of the state of New York and under the statutory and/or common law of each and every state in which Wiley engages in such actions in that Wiley's actions are willful and with the intent to deceive and are likely to cause confusion and deception, and to  misappropriate DMEF's Trademark, reputation, and goodwill.

LEGAL_US_E # 78085304.3

66.    Unless enjoined by this Court, Wiley's intended unauthorized use of the Trademark will cause irreparable harm, damage, and injury to DMEF, for which DMEF has no adequate remedy at law.

### Count Four

### Declaratory Judgment Based on Section 43(a) of the Lanham Act

67.    DMEF repeats and realleges paragraphs 1 to 66 as if fully set forth herein.

68.    DMEF's Trademark, JOURNAL OF INTERACTIVE MARKETING, is used as the title of a quarterly publication, which has been published under that name since 1998.

69.    Each publication of the JIM has unique volume and issue numbers associated with the ISSN that identify that publication, when used with the Trademark, as originating from the same source and following in sequence from the previously-numbered publication of the JIM.

70.    DMEF intends to continue publishing its journal under its Trademark after the one-year limited license to Wiley expires or is abandoned.

71.    For a serial publication, in which individual issues of a journal are identified by the combination of the journal name, the ISSN, and the specific volume and issue numbers, the numbering sequence functions as and contributes to the source identifier in connection with and appurtenant to the registered Trademark.

72.    DMEF, in conjunction with Medill and Wiley, already has published Volume 1, No. 1 (Winter 1987) through Volume 21, No. 4 of the JDM and JIM. Were DMEF not permitted to continue the volume and issue numbering with the journal title and ISSNs when it resumes publication of the JIM, the market would likely be confused and DMEF would not be able properly to use its Trademark in connection with the goods for which the Trademark is registered.

73.    DMEF's continuing the volume and issue numbering sequence in connection with the JIM title and assigned ISSNs is the only way to avoid confusion because DMEF is the trademark

- 14 -

owner and the use of the Trademark combined with the ISSNs and the volume and issue number will provide the necessary and expected continuity to serve as an identifier of the product emanating from a single source, and to signify a product subject to the quality control of DMEF, its appointed editors, and the Editorial Review Board, as it has for twenty years.

74.     DMEF is thus entitled to a judgment of this Court declaring that it has the right to continue the volume and issue numbering sequence currently associated with the *Journal of Interactive Marketing* and the assigned ISSNs, when it resumes publishing under that name, in that such use will avoid confusion in the marketplace.

### Count Five

### Declaratory Judgment Based on Common Law Infringement and Unfair Competition

75.     DMEF repeats and realleges the allegations contained in paragraphs 1-74 as if fully set forth herein.

76.     DMEF's continuing the volume and issue numbering sequence in connection with the JIM title and the assigned ISSNs is the only way to avoid confusion because DMEF is the trademark owner and the use of the Trademark combined with the ISSN reference and volume and issue number will provide the necessary and expected continuity to serve as an identifier of the product emanating from a single source, and to signify a product subject to the quality control of DMEF, its appointed editors, and the Editorial Review Board, as it has for twenty years.

77.     DMEF is thus entitled to a judgment of this Court declaring that it has the right to continue the volume and issue numbering sequence currently associated with the *Journal of Interactive Marketing* and the assigned ISSNs when it resumes publishing under that name, in that such use will avoid confusion in the marketplace.

LEGAL_US_E # 78085304.3

WHEREFORE, DMEF respectfully requests that this Court enter judgment in its favor and against Wiley as follows:

(a)    Preliminarily and permanently enjoining defendant, its officers, agents, servants, employees and attorneys, and those acting in concert with them from

(i) publishing any "Best of" issue under the name *Journal of Interactive Marketing*, or under any name that is likely to cause confusion with DMEF's Trademark or tradename, without DMEF's written approval of the content;

(ii) publishing any journal under the name *Journal of Interactive Marketing*, or under any name that is likely to cause confusion with DMEF's Trademark or tradename, without DMEF's written approval of the content;

(iii) representing by any means whatsoever, directly or indirectly, that any products or services offered by defendant are associated with, sponsored, endorsed or authorized by, or connected or affiliated with DMEF, except as explicitly provided by the parties' Agreement or with DMEF's written approval;

(b) A judgment, pursuant to 28 U.S.C. §§ 2201 *et seq.*, declaring that the ISSN and volume and issue numbers used in conjunction with the journal name *Journal of Interactive Marketing* are inseparable from the rights in that title, that DMEF may continue the volume and issue numbering sequence under the same ISSN when it resumes publishing under that title, and that such use of the volume and issue numbering sequence does not constitute a false or misleading statement, is not likely to cause confusion as to source or affiliation, does not constitute unfair competition or deceptive practices, and does not violate any statutory or common law rights of the defendant; and

LEGAL_US_E # 78085304.3

(c) Such other and further relief as this Court deems just and proper.


Dated: New York, NY
      February 11, 2008

                    Respectfully Submitted,

                    PAUL, HASTINGS, JANOFSKY &
                    WALKER, LLP

                    By:  Robert L. Sherman (RS 5520)

                    75 East 55th Street
                    New York, NY 10022
                    (212) 318-6000 (telephone)
                    (212) 318-6847 (facsimile)

                    Attorneys for Plaintiff
                    Direct Marketing Educational Foundation, Inc.

# EXHIBIT A

**Int. Cl.: 16**

**Prior U.S. Cls.: 2, 5, 22, 23, 29, 37, 38, and 50**

**Reg. No. 2,177,647**

# United States Patent and Trademark Office

Registered July 28, 1998

## TRADEMARK
### SUPPLEMENTAL REGISTER

## JOURNAL OF INTERACTIVE MARKETING

DIRECT MARKETING EDUCATIONAL FOUN-
DATION, INC. (ILLINOIS CORPORATION)
1120 AVENUE OF THE AMERICAS
NEW YORK, NY 10036 DIRECT MARKETING
EDUCATIONAL FOUNDATION, INC. (ILLI-
NOIS CORPORATION)

1120 AVENUE OF THE AMERICAS
NEW YORK, NY 10036

FOR: JOURNALS PUBLISHED QUARTERLY
CONTAINING ARTICLES FOCUSED ON ACA-
DEMIC RESEARCH IN THE AREAS OF
DIRECT MARKETING AND INTERACTIVE
MARKETING, IN CLASS 16 (U.S. CLS. 2, 5, 22,
23, 29, 37, 38 AND 50).

FIRST USE 1–30–1998; IN COMMERCE
1–30–1998.

SER. NO. 75–081,494, FILED P.R. 4–1–1996; AM.
S.R. 2–11–1998.

ELISSA GARBER KON, EXAMINING ATTOR-
NEY

# EXHIBIT B

~~DRAFT~~ AGREEMENT BETWEEN
JOHN WILEY & SONS, INC.
and
DIRECT MARKETING EDUCATIONAL FOUNDATION

This Agreement made and entered into this 5 day of August 1988 by and between John Wiley & Sons, Inc. (hereinafter called Wiley) and the Direct Marketing Educational Foundation (hereinafter called DMEF) with respect to publication of an existing journal entitled the JOURNAL OF DIRECT MARKETING (hereinafter called the Journal) now published by DMEF.

This Agreement is entered into for the publication and distribution of the official Journal of DMEF by Wiley in conjunction with DMEF under the following terms and conditions:

1. OWNERSHIP. DMEF is the owner of the tradename and trademarks in the Journal and shall register same. DMEF licenses Wiley for the term of the agreement (and any extensions thereof) for exclusive use of the tradename and trademark and Wiley will take proper precautions to preserve registration. Ownership of the subscriber lists and back volume inventory for the Journal will be transferred from the DMEF to Wiley who will publish the Journal under license as the sole official journal of the DMEF.

2. FIRST WILEY ISSUE. First issue published by Wiley will be Volume 2(2). Volume 2(3) and 2(4) will be published as close as possible to September and December 1988, respectively.

3. SCHEDULE. During each calendar year starting with 1989, Wiley will publish one volume of the Journal in minimum 64-page quarterly issues (cover dates will be March, June, September, December) in a 8 1/4 x 11 trim size in an agreed-upon format at least equivalent in editorial content, to the 64-page issue of the current Journal.

   In the twelve-month period January to December 1988, and in each consecutive twelve-month period thereafter during the life of this contract, DMEF agrees to furnish or cause to be furnished to Wiley on a quarterly basis manuscripts sufficient to publish one volume of the Journal consisting of not fewer than 256 printed pages in a 8 1/4 x 11 trim size and format and Wiley agrees to publish same in quarterly issues, each issue consisting of scholarly, peer-reviewed articles and selected departments and features. Wiley shall have final decision as to design and format.

4. EDITOR. The DMEF will appoint the Editor with the concurrence of Wiley and provide all necessary support for the editorial office. Members of editorial board will be selected by the Editor. Journal will continue to publish

scholarly, professional, peer-reviewed articles, features and departments on direct marketing. Responsibility for the solicitation of manuscripts, editorial selection, and approval of copy rests with the Editor. General editorial policy will be set by the DMEF with the concurrence of Wiley.

DMEF has appointed Don Schultz as Editor and Wiley concurs with such appointment. DMEF shall have the right, after consultation with Wiley, to terminate an appointee as Editor and to appoint a successor editor upon the termination of an editor's appointment or an editor's resignation.

The Editor of the Journal will be responsible for all editorial functions of the Journal receiving such guidance from DMEF as he and DMEF shall agree. The Editor shall be required to sign a three-year Editor's agreement satisfactory to both Wiley and DMEF in substantially the form attached as Attachment A.

The Editor will evaluate submitted manuscripts, obtain peer reviews, select suitable contributions, and arrange for each contributing author to transfer his or her copyright to Wiley in the form of a contributor's agreement as required by Wiley. Where necessary, the Editor will make or request the contributor to make such revisions in the manuscript as the Editor deems necessary. The Editor will submit to Wiley the final manuscripts as available, including any material to be written by the Editor, in accord with a schedule (See Attachment B) and in a format to be established by Wiley. The final manuscripts will conform to requirements established by Wiley and will be accompanied by all appropriate camera-ready illustrative material and necessary artwork, with written permission as required. The Editor will give serious and appropriate consideration to advice from Wiley on matters in which the Editor has sole responsibility.

Wiley shall absorb authors' alterations up to ten percent (10%) of the cost of composition and the excess costs, if any, may be charged to DMEF subject to reimbursement from the authors. Authors' alterations are defined as deletions, additions, and other revisions made in proofs by the author other than for printer's errors. Editor's alterations, similarly defined and in excess of ten percent (10%), shall be charged to DMEF, except that DMEF shall not be charged for the Editor's corrections of any changes made by Wiley in final technical copyediting which the Editor finds to be mistaken or objectionable.

2

5. OFFICIAL DESIGNATION. For the term of this Agreement, the Journal will remain the sole official journal of the DMEF and Wiley will display prominently on the masthead and cover, in language approved by the DMEF, that the Journal is published by Wiley in conjunction with the DMEF. Names of appropriate officers of the DMEF will appear on the masthead.

DMEF will list or announce the Journal as its official journal on its stationery and other external communications. During the term of this Agreement DMEF will not sponsor nor collaborate in the publication of a competing journal

6. PRICES. Wiley shall be responsible for the non-editorial affairs of the Journal, having sole responsibility for copyediting, production, pricing, sale, and distribution of the Journal, for the number of copies of each issue to be printed and reprinted, and for all costs with respect to such responsibilities. Wiley will give serious and appropriate consideration to advice from the Editor on all matters in which Wiley has sole responsibility.

Wiley will set prices for the Journal for the term of the Agreement: institutional (libraries, academic and corporate); non-member individuals; and member individuals (people who work at or for DMEF/DMA member companies or universities). The 1988 and 1989, Volume 2 and 3 prices will be as follows: institutions, $120; non-member individuals, $70; member individuals, $50. In the future, the member individual price will not be greater than fifty percent (50%) of institutional price. The non-member individual price will always be greater than the member individual price. Wiley will also set prices for back issues, reprints, microfilms, advertising and permissions.

7. MARKETING. The DMEF will assist Wiley in marketing the Journal by including Wiley-produced promotion in appropriate DMEF member mailings and displaying promotional material at its conferences, workshops and seminars. The DMEF will make best efforts to obtain assurances for similar marketing cooperation from the DMA. DMEF will provide input and advice to Wiley on marketing strategy and tactics to which Wiley will give serious and appropriate consideration. Wiley will use DMEF non-subscriber lists to promote the Journal only. Wiley may use subscription list of Journal to promote other Wiley products. The DMEF will have without

3

charge, up to four (4) non-editorial pages in each issue, as well as the use of the Journal's subscription list without rental charge to promote DMEF/DMA activities. Subscriber list will be made available by Wiley through Wiley list broker and all customary procedures, including list remaining at mail house at all times, will apply.

Broad policies with respect to paid advertisements for inclusion in the Journal shall be developed by Wiley, in consultation with DMEF and the Editor, and shall be subject to their approval, not to be unreasonably withheld. Obtaining paid advertisements, if any, and the administration of the policy approved, shall be the responsibility of Wiley, which may, at its discretion, appoint sales representatives for the purpose.

8.  BACKVOLUMES.  Within thirty (30) days of signing this Agreement, DMEF will turn over to Wiley its backvolume inventory (See Attachment C) of Volumes 1(1-4) and 2(1)--at least 50 copies of each Volume 1 issue and 1,000 copies of 2(1)--as well as all non-editorial files and material and Copyright Transfer forms from each author in Volume 1(1-4) and 2(1).  For those authors who have not to date provided a Copyright Transfer for their contribution published in Volumes 1(1-4) or Volume 2(1) that is satisfactory to Wiley, DMEF agrees to carry out in conjunction with the aforementioned Dr. Schultz, a thorough and prompt good faith effort to obtain said Copyright Transfer on a form acceptable to Wiley (see Section 9 below).  Agreement will entitle Wiley to reprint or sell these back issues and to grant permission to third parties to use material from these issues.

9.  COPYRIGHT.  The Journal will be copyrighted in the name of DMEF and Wiley, and Wiley will cause to be included in each issue of the Journal that it publishes, a copyright notice in the names of DMEF and Wiley sufficient in form and placement to satisfy the requirements of the United States Copyright Law and to secure the protection of the Universal Copyright Convention.  Copyright shall be promptly registered by Wiley in the United States Copyright office in the joint name and at Wiley's own expense.

The DMEF hereby grants and transfers to Wiley for the term of this Agreement the full and exclusive rights, throughout the world, to publish, republish and distribute the Journal by itself and with others, and to prepare, publish and distribute derivative works based thereon, in English and in other languages, in all media of expression now known or later developed, and to license or permit others to do so.

4

Wiley will furnish to the DMEF and to the Editor, copies of the form of Copyright Transfer (Exhibit D) which shall be signed by each author whose materials shall appear in the Journal, and shall transfer all rights in the copyright to Wiley and DMEF jointly. The Editor shall have the responsibility to obtain such Copyright Transfer and deliver same to Wiley prior to publication of such material in the Journal.

10. REVENUES DURING TRANSITION. All journal revenue received by the DMEF or the Journal for Volume 1, 2, or 3 prior to April 1, 1988, will be retained by the DMEF. Subscription, advertising, and other income and receipts pertaining to the Journal received by the Journal or DMEF on or after April 1, 1988, will be turned over to Wiley within 30 days after signing and periodically thereafter.

The DMEF shall have the right to audit, at its own expense and during reasonable business hours at the offices of Wiley, no more than once per fiscal year, the books and records of Wiley as they pertain directly to this contract.

11. SUBSCRIBER LISTS. Upon signing the DMEF will turn over to Wiley the names and addresses of all paid subscribers to the Journal in its possession, currently estimated at ~900 subscribers. Wiley will pay DMEF $5 for each paid DMEF subscriber, (see Attachment E) as well as $5 for each unduplicated Journal of Direct Marketing Research (Silverman) subscriber (see Attachment F) now in possession of DMEF—numbers currently estimated to be 700 and 200, respectively. Wiley will fulfill this paid subscription liability on issue-for-issue basis.

Moreover, DMEF has in its possession a list of ~140 "bill-me" (non-paid) subscribers who have requested and received issues of the Journal and for which DMEF is owed payment (See Attachment G). DMEF will endeavor immediately via a telemarketing campaign with letter follow-up to obtain payment from these subscribers. Cost will be borne directly by DMEF; revenue will go to Wiley. These 140 "bill-me" subscribers will receive Volume 2(1) at the expense of DMEF. DMEF warrants the accuracy of Attachments E, F and G here and in Section 20 below, as of June 1, 1988.

5

12. ROYALTY. During the term of this Agreement, Wiley will for each volume that Wiley publishes in its entirety, with the exception of Volume 2, pay the DMEF a ten percent (10%) royalty on (a) net subscription revenue (subscription sales after commission and agent discounts); (b) net advertising sales (advertising sales after sales commission and agency sales (advertising sales after sales commission and agency discounts); (c) net revenue from books of collected articles from the Journal; (d) rental of subscriber list.

Royalty payments will be made in April of the year following the completion of each Volume. Royalty for Volumes 2, 3, 4, 5, (1988, 89, 90, 91) will be guaranteed at a minimum level of eight (8), thirteen (13), sixteen (16), and eighteen (18) thousand dollars, respectively.

13. BULK COPIES. Wiley will provide the DMEF 100 free bulk copies of each issue, not to be resold. DMEF can buy up to an additional 150 bulk copies of upcoming issues at fifty percent (50%) off the lowest subscription price, provided order is placed in writing at least one week prior to "To Press" date of said issue. Bulk copies are for promotion of DMEF activities and the Journal and will therefore not be provided on a regular basis to the same individual or organization in lieu of a subscription. All bulk copies will contain subscription card, order form and promotional letter.

Wiley will provide each editorial board member a complimentary subscription up to a maximum of forty (40).

14. TERM OF AGREEMENT. Effective date of agreement will be April 1, 1988, and initial term will end December 31, 1997. Agreement will automatically renew for five (5) year terms thereafter, unless either party gives written notice of non-renewal at least ten (10) months prior to expiration of the term.

15. NON-RENEWAL BY WILEY. If after initial term or subsequent terms Wiley chooses to not renew the agreement, it may continue to publish the Journal providing that it (a) changes the title within one (1) year of the date of termination specified in the Notice of Termination sent by Wiley to the DMEF and (b) pays the DMEF royalties as described in Section 12 for each of the two (2) years following non-renewal, and (c) carries a notification in each issue for two (2) years after termination that the Journal is no longer the official journal of the DMEF. Backvolume inventory and subscriber list remain property of Wiley.

6

16. **NON-RENEWAL BY DMEF.** If after the initial term or subsequent terms the DMEF chooses not to renew the agreement Wiley may continue to publish the Journal providing that it (a) changes the title within one (1) year of the date of termination specified in the Notice of Termination sent by the DMEF to Wiley and (b) carries a notification in each issue for two (2) years after termination that the Journal is no longer the official journal of the DMEF. Backvolume inventory and subscriber list remain property of Wiley.

17. **SALE OF SUBSCRIBER LIST.** If during the term of this agreement Wiley desires to sell the subscriber list and backvolumes of the Journal and the right to publish the Journal under the present title, it shall inform the DMEF in writing and such sale shall be subject to the DMEF's approval, not to be unreasonably withheld.

   a.  If the DMEF agrees to such a sale, the purchaser shall assume all rights and obligations of the agreement, including the right to publish under the present title, and Wiley shall divide the purchase price as follows: 90% to Wiley, 10% to the DMEF. In this event, copyright in issues published during term(s) of the agreement will reside jointly with DMEF and the purchaser.

   b.  If the DMEF wishes to withhold its approval of sale, and does not choose to purchase the subscriber list and inventory under the terms of Paragraph 18 below, then Wiley may proceed with a sale to a third party purchaser. Any such sale will be made with the requirement that purchaser (a) changes the name of the Journal within one (1) year of the date of such sale and (b) carries a notification for two (2) years of the date of such sale in each issue that the Journal is no longer the official journal of the DMEF and publishes without DMEF affiliation. In this event, copyright in issues published during term(s) of the agreement will reside jointly with DMEF and the purchaser.

   c.  Wiley shall inform the DMEF within 30 days of the name(s) of potential purchasers who have delivered in writing to Wiley an acceptable offer to buy said list and inventory and the right to publish. Wiley shall determine at its sole discretion if offer is "acceptable". DMEF shall have the right (but not the

7.

obligation) to purchase said list and backvolume inventory by matching this offer within 30 days.

18. WILEY CEASES PUBLICATION.  At any time during the term of this Agreement or extensions thereof Wiley shall have the right at its sole discretion to cease publication of the Journal and sell back volumes, the subscriber list and the right to publish the Journal.  If Wiley chooses to cease publication, it will so inform the DMEF within thirty (30) days of such a decision and the DMEF shall have the right (but not the obligation) to purchase the subscriber list and backvolumes of the Journal at a price equivalent to $5 a subscriber and $1 per copy of backvolume inventory starting with Volume 2(2) -- adjusted to account for cumulative monthly increase in CPI from April 1, 1988.  Publication will be deemed to have been ceased if, beginning with Volume 3, Wiley allows an interval of greater than six (6) months to elapse between publication of consecutive issues -- provided this lapse in publication is not the result of a lack of manuscripts delivered to Wiley from the editorial office.

19. TAKEOVER OF WILEY.  Wiley will be able to assign this Agreement only with the prior written approval of the DMEF, such approval not to be unreasonably withheld, except to a corporation which by merger or purchase succeeds to substantially all of the business and assets of Wiley. In case of such a "takeover" the DMEF shall have two (2) months to notify Wiley in writing that it wants to terminate sponsorship of the Journal.  In this case, the DMEF shall have the right to terminate the agreement on six (6) month's written notice and Wiley (or its successors or assigns) may continue to publish the Journal providing that it (a) changes the title within one (1) year of the effective date of termination and (b) carries a notification in each issue for two (2) years after termination that the Journal is no longer the official journal of the DMEF.

20. WARRANTIES.  DMEF warrants that the material to be published in the Journal will contain no libelous or unlawful statements, and will not infringe upon or violate any copyright or trademark, or violate the privacy of any person.  Moreover, DMEF hereby warrants in a like manner the material published in Volume 1(1-4) and Volume 2(1).

DMEF warrants that it has unrestricted ownership of the Journal and the right to enter into this agreement.

DMEF warrants that the number of subscribers in its possession and the number of issues they are owed is as represented in Attachments E, F, and G as of June 1, 1988.

8

DMEF holds Wiley harmless from any damages or costs it may suffer or incur, including attorneys' fees, arising out of a breach of these warranties. Wiley will have the right not to publish any manuscript which, in its reasonable judgement, violates the rights of another party, or any applicable governmental law or regulation.

21. PROVISIONS. The parties hereto will from time to time sign, execute and deliver all such assignments and other documents which are instruments of transfer and all such other documents or instruments, and will perform all such other acts or things, as may be reasonably necessary to carry out the provisions of this Agreement.

22. NOTICE. Any notice to be given hereunder shall be in writing and shall be mailed, certified or registered, return receipt requested, addressed to the other party as follows:

TO WILEY:

Myer Kutz
Vice President
John Wiley & Sons, Inc.
605 Third Avenue, 10th Floor
New York, New York 10158

TO DMEF:

Richard L. Montesi
President
Direct Marketing Educational Foundation
6 East 43rd Street
New York, New York 10017

23. The failure of either party to claim a breach of any of the provisions of this Agreement shall not be, or be held to be, a waiver of any subsequent breach.

9

24. This Agreement shall in all respects be interpreted, construed, and governed as if wholly entered into and executed within the State of New York. This Agreement constitutes the entire understanding between the parties and supercedes any prior agreements, written or otherwise, with respct to the matter. This Agreement may not be modified or amended, nor may any of its terms or provisions be waived, except by a written instrument executed by the party affected by such modification, amendment, or waiver. It shall inure to the benefits of and be binding upon the parties hereto and their respective successors, heirs, and assigns.

In witness whereof the parties have duly executed this Agreement on the day and year first written above:

Direct Marketing                          John Wiley & Sons, Inc.
Educational Foundation


_____                   _____
John D. Yeck                              Myer Kutz
Chairman, DMEF                            Vice President

_____
Richard L. Montesi
President, DMEF

10

Amendment to the Agreement of August 5, 1988, by and between John Wiley & Sons, Inc. and the Direct Marketing Educational Foundation with respect to publication of an existing journal entitled the Journal of Direct Marketing.

I. The parties agree that, in addition to the current provisions of item 12 of the Agreement concerning royalty payments, royalty for volumes 6 to 10, inclusive, will be guaranteed at a minimum level of eighteen thousand dollars ($18,000). Royalty for volumes 11 to 16, inclusive, shall be guaranteed at a minimum level of twenty thousand dollars ($20,000).

II. With reference to item 14 concerning the term of the Agreement, the parties agree that the initial term of the Agreement will end December 31, 2007. The agreement will automatically renew for ten (10) year terms thereafter, unless either party gives written notice of non-renewal at least ten (10) months prior to the expiration of the term.

Direct Marketing
Educational Foundation

John Wiley & Sons, Inc.

by Richard L. Montesi   Date
President, DMEF
11-2-92

by Thomas Conter   Date 9/23/92
Vice President
Professional and
Subscription Division