PAUL, HASTINGS, JANOFSKY & WALKER LLP
Robert L. Sherman (RS 5520)
75 East 55th Street
New York, NY 10022
Telephone: (212) 318-6000
Facsimile: (212) 318-6847

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DIRECT MARKETING EDUCATIONAL FOUNDATION, INC.<br><br>                             Plaintiff,<br><br>     - against -<br><br>JOHN WILEY & SONS, INC.,<br><br>                          Defendant. | Case No. 08 CV 1464 (LMM) |

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

**Page**

I.     PRELIMINARY STATEMENT ......................................................................1
II.    STATEMENT OF FACTS ............................................................................2
      A.     DMEF ...............................................................................................2
      B.     DMEF's Journal ...............................................................................3
      C.     Impact Factor ...................................................................................5
      D.     Termination Of The Agreement .......................................................6
      E.     Wiley's Wrongful Conduct ..............................................................7
ARGUMENT...................................................................................................8
III.   DMEF'S MOTION FOR A PRELIMINARY INJUNCTION SHOULD BE
      GRANTED. ...................................................................................................8
      A.     DMEF Is Likely To Succeed On The Merits .....................................9
      B.     DMEF Will Be Irreparably Harmed Absent Injunctive Relief............12
CONCLUSION ...............................................................................................15

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC,*
  447 F. Supp. 2d 266 (S.D.N.Y. 2006), *aff'd,* 247 Fed. App'x 232 (2d Cir. 2007) ..................... 11

*AB Electrolux v. Bermil Industrial Corp.,*
  481 F. Supp. 2d 325 (S.D.N.Y. 2007) ........................................................................................ 12

*Brennan's, Inc. v. Brennan's Restaurant, L.L.C.,*
  360 F.3d 125 (2d Cir. 2004) ...................................................................................................... 11

*Church of Scientology International v. Elmira Mission of the Church of Scientology,*
  794 F.2d 38 (2d Cir. 1986) .................................................................................................. 10, 12

*Dawn Donut Co. v. Hart's Food Stores, Inc.,*
  267 F.2d 358 (2d Cir. 1959) ...................................................................................................... 11

*E.G.L. Gem Laboratory Ltd v. Gem Quality Institute, Inc.,*
  90 F. Supp. 2d 277 (S.D.N.Y. 2000), *aff'd,* 5 Fed. App'x 81 (2d Cir. 2001) ........................... 9, 10

*El Greco Leather Products Co. v. Shoe World, Inc.,*
  806 F.2d 392 (2d Cir.1986) ..................................................................................................... 2, 11

*Hawaii-Pacific Apparel Group, Inc. v. Cleveland Browns Football Co. LLC,*
  No. 04 Civ. 7863 (DC), 2006 WL 488569 (S.D.N.Y. Feb. 23, 2006) .......................................... 12

*Murjani Int'l, Ltd. v. Sun Apparel, Inc.,*
  No. 87 CIV. 4628 (PKL), 1987 WL 15110 (S.D.N.Y. July 31, 1987) ..................................... 9, 10

*Original Appalachian Artworks, Inc. v. Granada Electrics, Inc.,*
  816 F.2d 68 (2d Cir. 1987) ........................................................................................................ 10

*Polaroid Corp. v. Polarad Electrics Corp.,*
  287 F.2d 492 (2d Cir. 1961) ...................................................................................................... 11

*Prudential Insurance Co. of America, Inc. v. Ikomoni,*
  No. 96 CIV. 7272 (RO), 1996 WL 640915 (S.D.N.Y. Nov. 6, 1996) ......................................... 13

*Ryan v. Volpone Stamp Co.,*
  107 F. Supp. 2d 369 (S.D.N.Y. 2000) ....................................................................................... 13

*Sunward Electrics v. McDonald,*
  362 F.3d 17 (2d Cir. 2004) ........................................................................................................ 10

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*The Echo Design Group, Inc. v. Zino Davidoff S.A.,*
   283 F. Supp. 2d 963 (S.D.N.Y. 2003) ........................................................................... 12

*Tom Doherty Associate, Inc. v. Saban Entertainment, Inc.,*
   60 F.3d 27 (2d Cir. 1995) ........................................................................................ 9

*Twentieth Century Fox Film Corp. v. Marvel Enterprises, Inc.,*
   277 F.3d 253 (2d Cir. 2002) ................................................................................ 11, 12

*Warner-Lambert Co. v. Northside Development Corp.,*
   86 F.3d 3 (2d Cir. 1996) ........................................................................................ 9

*Zino Davidoff S.A. v. CVS Corp.,*
   No. 06-CV-15332KMK, 2007 WL 1933932 (S.D.N.Y. July 2, 2007) ........................................... 2

## STATUTES

15 U.S.C. § 1065 ........................................................................................................ 9

15 U.S.C. § 1114(1)(a) ................................................................................................. 9

## MISCELLANEOUS

1 J. Thomas McCarthy, McCarthy On Trademarks and Unfair Competition § 3:10 (4th ed.
   2007) ................................................................................................................ 10

Plaintiff Direct Marketing Educational Foundation ("DMEF") submits this memorandum in support of its motion for a preliminary injunction prohibiting defendant John Wiley & Sons, Inc. ("Wiley") from publishing a journal using DMEF's registered trademark, *Journal of Interactive Marketing*, without first submitting the content thereof to DMEF for its approval of the Journal's quality.

## I.    PRELIMINARY STATEMENT

By this motion, DMEF seeks injunctive relief to prevent Wiley from depriving DMEF of one of the most valuable rights that the law accords a trademark owner – the right to control the quality of the goods used in connection with its trademark. For the past 40 years DMEF has established itself as a respected leader in the field of direct and interactive marketing education. As a not-for-profit educational foundation, DMEF has no asset more valuable than its reputation. DMEF continually strives to build on its reputation and goodwill, and takes great care to ensure that its many initiatives all meet or exceed the high standard that direct marketing students, academics and professionals have come to expect from it. DMEF's *Journal of Interactive Marketing* ("JIM") is no exception.[1] Since the inception of its journal in 1988, DMEF has consistently published the leading scholarship in the field.   It has done so by ensuring that it maintained control over the entire editorial process, including the solicitation, selection and editing of the articles to be

---

[1]    The journal was originally known as the *Journal of Direct Marketing*. Remaining at the forefront of an evolving field, DMEF changed the name of the journal to the *Journal of Interactive Marketing* in 1998, but the underlying nature, quality and focus of the journal on the academic discipline of direct marketing has remained constant throughout. For simplicity, we will refer to the journal as the JIM.

published in the journal.[2]  Wiley, a publishing company that DMEF engaged to publish, distribute and market its journal, now plans to usurp DMEF's editorial authority.  Wiley has a stated intention of publishing two issues of the JIM without allowing DMEF to review and approve the articles to be included.  The two issues will be compiled from articles previously published in the JIM.  Instead of showcasing new research and scholarship submitted to DMEF and which is available to be published, the issues that Wiley intends to publish will not contain any new information.  That is unacceptable to DMEF, which prides its journal as being a cutting-edge academic publication and forum for new ideas and information.  If not enjoined, Wiley will irreparably harm the good name of the JIM and the reputation and goodwill that DMEF and its JIM have developed over decades. Wiley's conduct constitutes trademark infringement which, if not prevented, will result in a deception on the public.

## II.    STATEMENT OF FACTS

### A.    DMEF

DMEF is a not-for-profit educational foundation established in 1966 to train college students and attract them to the field of direct and interactive marketing, and to increase and improve the teaching of direct and interactive marketing at colleges and universities.  Declaration of Terri Bartlett, dated February 12, 2008 ("Bartlett Decl."), ¶¶ 2-3.  When it began more than 40 years

---

[2]    It is the *control* over quality, not the quality itself, that is a trademark owner's right.  *El Greco Leather Products Co. v. Shoe World, Inc.*, 806 F.2d 392, 395 (2d Cir.1986) ("One of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's trademark. For this purpose the actual quality of the goods is irrelevant; it is the control of quality that a trademark holder is entitled to maintain.") (internal citations omitted).  *See also Zino Davidoff SA v. CVS Corp.*, No. 06-CV-15332 KMK, 2007 WL 1933932, *7 (S.D.N.Y. July 2, 2007) ("Notably, however, to establish a Lanham Act violation, a plaintiff need not demonstrate that there are *actual* quality differences between the authorized goods and the gray-market goods; it is *the right* to control quality, rather than the quality itself that is protected under this test.") (citing *El Greco Leather Products*, 806 F.3d at 395).  Here, both are at risk.

ago, there were but a handful of undergraduate courses devoted to direct mail. *Id.,* ¶ 4. Now there are hundreds of courses in direct, interactive marketing and e-commerce at both the undergraduate and graduate level. *Id.,* ¶ 5. As a direct result of DMEF's perseverance, one now can count at least twenty direct marketing degree and certificate programs, with still more undergraduate majors and concentrations, offered at the nation's leading colleges and universities. *Id.*

DMEF itself offers collegiate institutes for college seniors and advanced institutes for college professors. It also offers students the opportunity to enhance their educational experience and provides them with an entrée to internships and employment opportunities. *Id.,* ¶ 3. DMEF has directly served more than 4,000 students and more than 1,700 professors who have participated in its innovative and high-caliber programs and activities. *Id.,* ¶ 5.

Academic research is an important and integral element of DMEF's mission. *Id.,* ¶¶ 2, 3, 6. To be recognized as an academic discipline, the field of direct and interactive marketing must have a body of knowledge – bona fide, published, academic research. DMEF and its journal satisfy that need.

**B.    DMEF's Journal**

As part of its strategy to have a significant and positive impact on academia, in 1987, DMEF announced its plans to create an academic journal that would publish leading research and scholarship in the field of direct marketing. *Id.,* ¶¶ 7-8. DMEF recognized the importance that academics at top institutions of higher learning place on conducting quality research and on having a highly-regarded publication to carry such research. *Id.,* ¶¶ 6. DMEF had the foresight to recognize the critical role a scholarly journal would play as a key component in establishing and fostering direct marketing as a bona fide academic discipline. In the year following the announcement of its journal, DMEF established and located its journal's headquarters at the top-ranked Medill School of Journalism at Northwestern University, formed an Editorial Review Board, and solicited

- 3 -

manuscripts. *Id.*, ¶ 7. The journal was entitled the *Journal of Direct Marketing* when it was first published in 1987; however, in 1998, DMEF changed the name of the journal to its current title, the *Journal of Interactive Marketing* ("JIM") to reflect changes in a dynamic discipline that DMEF itself helped – and continues to help -- to shape. *Id.*, ¶¶ 7, 11. DMEF owns a federal trademark registration for JOURNAL OF INTERACTIVE MARKETING for "journals published quarterly containing articles focused on academic research in the areas of direct marketing and interactive marketing." *Id.*, ¶ 11; Compl., Ex. A.

In creating a journal, it was essential for DMEF to maintain editorial control to ensure that the journal's content would always be consistent with the high standards that academia had already come to expect from DMEF. Bartlett Decl., ¶ 9. Because DMEF is an educational foundation and is not in the publishing business, in 1988 it sought to engage a publisher that would assume responsibility for the business aspects of the journal, such as the publishing, circulation, and marketing of the journal. *Id.*, ¶ 8. To that end, in 1988 DMEF entered into an agreement with Wiley (the "Agreement") that provided that Wiley would publish and distribute the journal. *Id.*; Compl., Ex. B. As part of the Agreement, DMEF granted Wiley a license to use the journal's trademark, initially, JOURNAL OF DIRECT MARKETING and currently JOURNAL OF INTERACTIVE MARKETING for the term of the Agreement and any extensions thereof. Compl., Ex. B, ¶ 1.

The Agreement memorializes DMEF's intent to retain editorial control over the journal while delegating non-editorial functions to Wiley. For example, under the Agreement, DMEF is responsible for: (1) furnishing or causing to be furnished manuscripts to Wiley; *id.*, ¶ 3; (2) appointing the journal's editor with the concurrence of Wiley, *id.* ¶ 4; (3) providing all necessary support for the editorial office, *id.*; (4) terminating an editor, with Wiley's concurrence, and appointing a successor editor, after consulting with Wiley; *id.*; and (5) setting general editorial policy,

- 4 -

with the concurrence of Wiley, *id.* Pursuant to the Agreement, it is clear that editorial responsibilities of DMEF, its appointed editors and its Editorial Review Board include soliciting manuscripts, evaluating manuscripts, obtaining peer review, and selecting and approving submitted articles for publication. *Id.*, ¶¶ 3-4.

By contrast, Wiley's responsibilities pursuant to the Agreement are decidedly non-editorial in nature. The Agreement explicitly provides that Wiley "shall be responsible for the non-editorial affairs of the Journal, having sole responsibility for copyediting, production, pricing, sale, and distribution of the Journal, for the number of copies of each issue to be printed and reprinted, and for all costs with respect to such responsibilities." *Id.*, ¶ 6. Additionally, under the Agreement, Wiley is responsible for developing broad policies regarding paid advertisements, in consultation with and subject to the approval of DMEF and the Editor. *Id.*, ¶ 7. The authority given to the DMEF-appointed editor even in non-editorial matters is clear in the plain language of the Agreement, which provides that Wiley "will give serious and appropriate consideration to advice from the Editor on all matters in which Wiley has sole responsibility." *Id.*, ¶ 6. The Agreement is crystal clear that DMEF, its appointed editor(s) and its Editorial Review Board had sole responsibility for the editorial content of the Journal while Wiley was responsible for handling the business aspects.

### C.    Impact Factor

In the academic world, the quality and reputation of social science journals are judged in part by the Social Science Citation Index (the "SSCI"), as measured and reported by ThomsonScientific Journal Citation Reports. Declaration of John Deighton, dated February 12, 2008 ("Deighton Decl."), ¶ 3. The SSCI measures a journal's "impact factor," which is driven in part by the strength of the editorial selections – the quality, timeliness and relevance of content solicited and chosen by a journal's editor(s). The impact factor is calculated by dividing the number

- 5 -

of citations made to articles in the journal in a particular year by the number of articles published in the journal in the prior two years. *Id.* The impact factor is a mark of the journal's importance and prestige and carries significant influence in the academic and scientific world. *Id,* ¶ 4. Journal prestige is a critical consideration in many aspects of academic life, including where scholars choose to publish, and who is eligible to receive grants or promotions. Because of its significance, university deans and professors closely monitor changes to a journal's impact factor. *Id.* The impact factor also influences circulation and subscription rates, as well as which publications are included in academic libraries. *Id,* ¶ 5. As such, the impact factor affects a journal's commercial success – a decline in a journal's impact factor damages its economic value. *Id.*

In 2006, JIM's impact factor rating was 1.457, which is considered to be a high rating. *Id.,* ¶ 6. It places JIM among the top-rated journals in the field of marketing. *Id.* That rating was achieved as a result of the substantial expertise, experience, dedication, and investment that DMEF and its editor(s) have put into soliciting, reviewing, editing, and publishing first-rate scholarly material. In addition, the JIM has had a very positive trend in its impact factor. Deighton Decl., ¶ 6. To maintain the high impact factor, the JIM's positive trend, and its associated influence and prestige, the JIM must continue to publish new, relevant, and timely material. *Id.* If the impact factor declines, it will compromise the JIM's prestige, which could have a compounding effect by compromising the journal's ability to attract high-quality manuscripts – and thus its subsequent impact factor – in the future. *Id.,* ¶ 7.

### D.    Termination Of The Agreement

In February 2007, in accordance with the prescribed process contained in the Agreement, DMEF sent Wiley a notice of non-renewal of the Agreement, with termination to be effective on December 31, 2007, the expiration of the Agreement's initial term as amended. Bartlett Decl., ¶ 12; Compl., Ex. B, Amendment ¶ II. Pursuant to the Agreement, following the effective

- 6 -

date of termination by either party, Wiley could elect to publish under DMEF's trademark, "Journal of Interactive Marketing," for one year (the "Transition Year"), but then had to change the title of its publication (by the end of the Transition Year). The Agreement further provides that Wiley's publication must include a disclaimer stating that the publication is no longer the official journal of DMEF. Compl., Ex. B ¶¶ 15-16. At about the time DMEF sent the notice of non-renewal of the Agreement, it notified Wiley that it planned to issue a request for proposal ("RFP") to a number of publishers, including Wiley, for future publication of the JIM. Bartlett Decl., ¶ 13. Wiley responded to DMEF's RFP with a proposal that included essentially the same terms as the parties' prior Agreement. *Id.* DMEF selected a different publisher, which had proposed more favorable terms, and entered into a publishing agreement with that publisher, effective January 1, 2008. *Id.*

### E. Wiley's Wrongful Conduct

In or about September 2007, Wiley notified DMEF of its intent to continue publishing under the JIM name for the one-year Transition Period. *Id.,* ¶ 14. DMEF and Wiley engaged in initial discussions regarding, among other things, DMEF's right to control the quality of content published under its name. *Id.* There was no dispute at that time over DMEF's right to control quality. *Id.*

In or about November 2007, Wiley -- without notice to DMEF or the Editorial Review Board -- unilaterally changed the process for submissions to the JIM, and instructed authors to submit manuscripts directly to Wiley rather than to the JIM's managing editor, located at DMEF's offices. *Id.,* ¶ 15. That was done without authorization from DMEF and in direct contravention of the Agreement. DMEF objected to Wiley's change in the submission process on the grounds that (1) DMEF has the right and obligation to continue to control the JIM's quality; (2) Wiley lacked the editorial experience and expertise in soliciting and selecting high quality relevant content for the JIM;

- 7 -

and (3) DMEF needed to ensure that the JIM maintained the reputation for high quality that it had developed over the years. *Id.*

In early January 2008, Wiley informed DMEF that for the first two issues to be published during the Transition Period, it planned to publish two compilations of past articles from the JIM as "Best of" editions. *Id.*, ¶ 16. DMEF informed Wiley that it did not approve of Wiley's plan, that it had received submissions of new articles that DMEF, its appointed editors, and the Editorial Review Board considered to be more appropriate and timely for forthcoming issues of the JIM, and that it had the right and obligation to control the quality of the material published under the JIM name. *Id.*, ¶¶ 17-18; Declaration of Russell Winer, dated February 11, 2008 ("Winer Decl."), ¶ 4. On or about January 14, 2008, the president of DMEF contacted Wiley to discuss DMEF's concerns over the quality of the content, to articulate DMEF's specific and significant concerns regarding Wiley's stated intent to publish two "Best of" issues without DMEF's editorial assistance, and to reassert DMEF's right and obligation to control the quality of any publication under its trademark. Bartlett Decl., ¶ 18. Wiley again rejected any effort by DMEF to control the content to be published under the JIM name during the Transition Period. *Id.* Unable to convince Wiley to honor its obligation to obtain DMEF approval of the JIM's content, DMEF commenced this action.

## ARGUMENT

### III.   DMEF'S MOTION FOR A PRELIMINARY INJUNCTION SHOULD BE GRANTED.

To be granted a preliminary injunction, a movant must demonstrate a likelihood of success on the merits and either (1) that irreparable harm would result absent injunctive relief or (2) sufficiently serious questions going to the merits exist, making them fair ground for litigation, and a

balance of hardships tips decidedly in its favor. *See Warner-Lambert Co. v. Northside Dev. Corp.*, 86 F.3d 3 (2d Cir. 1996); *Tom Doherty Assoc., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 33 (2d Cir. 1995).

### A.    DMEF Is Likely To Succeed On The Merits

Wiley's actions constitute trademark infringement. To establish a claim for trademark infringement under Section 32 of the Lanham Act, a plaintiff must show that the defendant uses a federally registered mark in commerce without consent and that such use is likely to cause confusion.[3] *See* 15 U.S.C. § 1114(1)(a); *Warner-Lambert Co.*, 86 F.3d at 6. DMEF can easily make the requisite showing.

In this circuit, products used in connection with a licensed mark that do not meet the licensor's quality control standards are not considered genuine products. *Id.* As such, the sale of inferior and/or unauthorized products under a licensed mark exceeds the scope of the license and constitutes trademark infringement. *Id. See also E.G.L. Gem Lab Ltd v. Gem Quality Institute, Inc.*, 90 F. Supp. 2d 277, 293 (S.D.N.Y. 2000), *aff'd*, 5 Fed. App'x 81 (2d Cir. 2001) ("sales of goods or services under the [licensed] mark which are outside the area of consent granted in the license are regarded as infringements of the mark"). *Id.* at 294, citing 2 J. Thomas McCarthy, McCarthy On Trademarks and Unfair Competition § 25:30, at 25-53 (4th ed. 1999) (internal quotations omitted); *Murjani Int'l, Ltd. v. Sun Apparel, Inc.*, No. 87 CIV. 4628 (PKL), 1987 WL 15110, *10 (S.D.N.Y. July 31, 1987) ("The sale by a licensee of unauthorized products, *i.e.*, products outside the scope of the license, is likely to confuse the public into believing that such products are in fact manufactured or authorized by the trademark owner. Thus, such conduct constitutes infringement.") (internal quotations omitted).

---

[3]    The ownership and validity of DMEF's mark is not in dispute. Indeed, DMEF's mark is incontestable. *See* 15 U.S.C. § 1065.

Here, Wiley intends to publish "Best Of" issues under DMEF's trademark without DMEF's approval, rendering those issues unauthorized and, therefore, infringing. Such use would exceed the scope of the license agreement and would likely "deceive the public into thinking that [Defendant] is authorized to provide the goods or services offered under the mark when in truth it is not." *E.G.L. Gem Lab Ltd.*, 90 F. Supp. 2d at 293.

The likelihood of confusion is increased in the licensor-licensee context because there is a heightened risk that the public would assume that the licensor approved the unauthorized goods. *See Church of Scientology Int'l v. Elmira Mission of the Church of Scientology,* 794 F.2d 38, 42 (2d Cir. 1986) ("[I]n a licensor/licensee case the reasons for issuing a preliminary injunction for trademark infringement are more compelling than in the ordinary case."); *Murjani Int'l, Ltd.*, 1987 WL 15110, at *10 ("Common sense compels the conclusion that a strong risk of consumer confusion arises when a terminated [licensee] continues to use the former [licensor's] trademarks."); *Sunward Elecs. v. McDonald*, 362 F.3d 17, 25 (2d Cir. 2004) ("There is a compelling need for injunctive relief especially when the case involves a former licensee because, after a license has been revoked, there is an increased danger that consumers will be confused and believe that the former licensee is still an authorized representative of the trademark holder.") Because Wiley has been publishing the Journal for the past 20 years with DMEF's approval, consumers will be justified in believing that future publications published by Wiley were approved by DMEF. They were not.

One of the principal functions of a trademark is to assure the public of a uniform level of quality. *Original Appalachian Artworks, Inc. v. Granada Elecs., Inc.*, 816 F.2d 68, 75 (2d Cir. 1987) (Cardamone, J., concurring) (discussing the "guarantee" function of trademarks, which serves to assure consumers that goods bearing the same mark are of consistent quality); *see generally* 1 J. Thomas McCarthy, McCarthy On Trademarks and Unfair Competition § 3:10 (4th ed. 2007) (explaining that trademarks signify "that the quality level... will remain consistent and predictable

- 10 -

among all goods or services supplied under the mark. Consumers expect this consistency and the law of trademarks embodies their expectation."). That is why a trademark owner/licensor has not only the *right*, but also the *obligation* to exercise quality control over its licensees' products bearing the mark. *Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 366 (2d Cir. 1959) ("We are all agreed that the Lanham Act places an affirmative duty upon a licensor of a registered trademark to take reasonable measures to detect and prevent misleading uses of his mark by his licensees or suffer cancellation of his federal registration."); *El Greco Leather Prods.*, 806 F.3d at 395 ("One of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's trademark."); *Twentieth Century Fox Film Corp. v. Marvel Enterprises, Inc.*, 277 F.3d 253, 259 (2d Cir. 2002) (a trademark owner-licensor is "obliged to maintain some control over the quality of the licensed property") (citing *Dawn Donut Co.*, 267 F.2d at 366 and 2 McCarthy on Trademarks and Unfair Competition § 18.42, at 18- 66 (4th ed. 2001)). Wiley would deprive DMEF of that right and prevent DMEF from fulfilling its obligation, thereby deceiving the public into believing that the journal has been published under the auspices of DMEF and in satisfaction of DMEF's standard of quality.

DMEF acknowledges that the courts of this circuit usually employ the eight factor test contained in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961) to evaluate the likelihood of confusion in trademark infringement cases. The *Polaroid* test requires an analysis of several non-exclusive factors, including: (1) the strength of the mark, (2) the degree of similarity between the two marks, (3) the competitive proximity of the products, (4) actual confusion, (5) the likelihood the plaintiff will bridge the gap, (6) the defendant's good faith in adopting its mark, (7) the quality of the defendant's products, and (8) the sophistication of the purchasers. *Brennan's, Inc. v. Brennan's Rest., L.L.C.*, 360 F.3d 125, 129 (2d Cir. 2004) (citing *Polaroid*, 287 F.2d at 495); *see also 24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC*, 447 F. Supp. 2d 266, 271 (S.D.N.Y. 2006), *aff'd*,

- 11 -

247 Fed. App'x 232 (2d Cir. 2007). Because this case involves a licensee's unauthorized use of

DMEF's trademark, all of the *Polaroid* factors inherently favor DMEF, thereby entitling DMEF to

injunctive relief. Furthermore, "in a licensor/licensee case the reasons for issuing a preliminary

injunction for trademark infringement are more compelling than in the ordinary case." *Church of*

*Scientology Int'l*, 794 F.2d at 42.

### B.    DMEF Will Be Irreparably Harmed Absent Injunctive Relief

Under the law of this circuit, once a trademark owner establishes infringement,

irreparable harm is established or, at a minimum, presumed, because infringement deprives the

trademark owner of control over its reputation.[4] That is especially true in the licensing context.

> A trademark licensor has a particular interest in controlling the use of
> its mark by its licensees in order to preserve the mark's quality and its
> continued vitality.... Denying a preliminary injunction in this case --
> where the district court found a likelihood of confusion -- puts
> [plaintiff licensor's] reputation beyond its own control. And, it is that
> loss of control which is the very thing that constitutes irreparable
> harm in the licensing context.

*Church of Scientology Int'l*, 794 F.2d at 43-44 (holding that in the licensing context, once a plaintiff

demonstrates unlawful use and consumer confusion, "a finding of irreparable harm is automatic" );

*see also The Echo Design Group, Inc. v. Zino Davidoff S.A.*, 283 F. Supp. 2d 963, 968 (S.D.N.Y. 2003)

("[C]ourts in the Second Circuit have allowed a showing of likelihood of confusion to establish both

---

[4]    Wiley's conduct also would deprive DMEF of its *obligation* to control the quality of the goods
used in connection with its mark. As the owner of a licensed trademark, DMEF is "obliged to
maintain some control over the quality of the licensed property as an incident of valid licensing
or risk abandonment of its mark." *Twentieth Century Fox Film Corp.*, 277 F.3d at 259; *see also*
*Hawaii-Pacific Apparel Group, Inc. v. Cleveland Browns Football Co. LLC*, No. 04 Civ. 7863 (DC),
2006 WL 488569 (S.D.N.Y. Feb. 23, 2006) ("A licensor ... is required to exercise some degree
of control over use of mark by licensee, at risk of abandonment of mark"); *AB Electrolux v.*
*Bermil Indus. Corp.*, 481 F. Supp. 2d 325 (S.D.N.Y. 2007) ("A trademark owner will be
considered to have abandoned its marks by licensing them to another without adequate control
over the quality of the products sold under the marks.")

a likelihood of success on the merits and irreparable harm, assuming that plaintiff has a protectable mark."); *Ryan v. Volpone Stamp Co.*, 107 F. Supp. 2d 369, 404 (S.D.N.Y. 2000) ("The mere loss of control over [a trademark owner's] reputation …constitute[s] the requisite irreparable harm."); *Prudential Ins. Co. of Am., Inc. v. Ikomoni*, No. 96 CIV. 7272 (RO), 1996 WL 640915, at *2 (S.D.N.Y. Nov. 6, 1996) ("The Second Circuit has…ruled that injunctive relief to prevent infringement of federally protected marks is appropriate without any separate showing of irreparable harm").

Under established precedent, DMEF is not required to make a separate showing of irreparable harm because Wiley's planned infringement would rob DMEF of its right to control its reputation and the goodwill corresponding to its trademark. Even if irreparable harm were not presumed here, DMEF easily establishes that it exists. If Wiley were permitted to publish the unauthorized content, DMEF will suffer immediate, substantial and irreparable injury to the JIM's impact factor and to DMEF's and JIM's reputation.

Wiley's planned conduct will diminish JIM's impact factor. JIM's most recent impact factor is 1.457. Deighton Decl., ¶ 6. That exceptional rating is important to JIM's ability to attract scholarly articles and maintain its high standing in the academic arena. *Id.*, ¶¶ 4, 7. Because the impact factor is based on the number of citations to articles in a journal, the re-publication in a "Best of" compilation of previously published material -- which would not attract new citations -- will negatively affect that rating. *Id.*, ¶ 7. The publication of two consecutive "Best of" issues of a quarterly academic journal would significantly diminish the journal's impact factor as well as damage the Journal's ability to attract, solicit, select, and publish new leading-edge research in the field. *Id.* The effect on the JIM and DMEF if the journal were to lose prestige due to a diminished impact factor would be immeasurable and long-lasting. If DMEF loses academia's respect, its leadership position is over. If Wiley is not enjoined from publishing the unauthorized issues, the JIM and

- 13 -

DMEF will suffer substantial and irreparable harm.  What took decades to establish will be destroyed in a matter of months.

By being deprived of its right to control the quality of the product offered in connection with its mark, DMEF will suffer harm to its reputation -- harm that is not easily quantifiable, and that, therefore, warrants injunctive relief.  Wiley undoubtedly will argue that because the past articles were once approved by DMEF, Wiley does not need DMEF's approval to compile the articles into a "Best of" issue.  Wiley's logic misses the point and only underscores its lack of the necessary expertise in the world of academic publishing.  The past articles were published because the Editorial Review Board decided *at that time* that the articles were fit for publication. *See* Winer Decl., ¶ 6.  Several factors go into selecting an article, including the timeliness of the topic. *Id.* ¶ 3.  Just because an article was approved 10 years ago, or even 3 years ago, does not mean that the editorial board would approve it today, especially considering that the direct marketing field is a dynamic field with new and cutting edge research and ideas continually being put forward. *Id*, ¶ 6. In addition, even were DMEF to publish a "Best of" issue on its own, it would maintain editorial control over the selection of the articles. *Id*, ¶¶ 6-7.  Wiley is preventing DMEF from doing just that.

Choosing previously published material requires the involvement of an experienced and knowledgeable editorial staff to assess the continued relevance of the selected articles, to distinguish seminal articles from those that have been disputed, and to ensure that the selected articles relate to each other so that there is coherence to the issue as a whole. *Id.* ¶ 6.  If Wiley, a publishing company that has never exercised editorial control over the JIM, is not restrained from its intended publication, there is a substantial risk of harm to DMEF in that it would compromise the

- 14 -

JIM's standing in the industry and cause serious harm to both the JIM's and DMEF's reputation, including the JIM's impact factor.[5]

## CONCLUSION

For the foregoing reasons, DMEF's motion for a preliminary injunction should be granted.

Dated: New York, NY
      February 14, 2008

Respectfully Submitted,

PAUL, HASTINGS, JANOFSKY & WALKER, LLP

By: Robert L. Sherman (RS 5520)

75 East 55th Street
New York, NY 10022
(212) 318-6000 (telephone)
(212) 318-6847 (facsimile)

Attorneys for Plaintiff
Direct Marketing Educational Foundation, Inc.

---

[5]   The alternative prong in the test for deciding whether to grant a preliminary injunction need not be addressed in view of the inherent and overwhelming showing that irreparable harm would result absent injunctive relief. Nonetheless, it is clear that the balance of hardships tips decidedly in DMEF's favor inasmuch as it would be deprived of its right as a trademark owner to control quality; it is exposed to reputational harm while Wiley will suffer no hardship; and deception of the public tied to DMEF's trademark would occur. There are no equities favoring Wiley and no hardships to Wiley to counter those serious risks.

LEGAL_US_E # 78129691.7