PAUL, HASTINGS, JANOFSKY & WALKER LLP
Robert L. Sherman (RS 5520)
75 East 55th Street
New York, NY 10022
Telephone: (212) 318-6000
Facsimile: (212) 318-6847

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DIRECT MARKETING EDUCATIONAL FOUNDATION, INC.<br><br>      Plaintiff,<br><br>- against -<br><br>JOHN WILEY & SONS, INC.,<br><br>      Defendant. | Case No. 08 CV 1464 (LMM) |

## REPLY MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

Page

I. DMEF IS LIKELY TO SUCCEED ON THE MERITS BECAUSE WILEY'S INTENDED USE OF DMEF'S TRADEMARK CONSTITUTES UNAUTHORIZED AND THEREFORE INFRINGING USE AS A MATTER OF LAW ................................................................................................................ 2

    A. DMEF Has The Right And The Obligation To Control The Quality Of Goods Offered In Connection With Its Trademark ................................ 2

    B. The Right To Control Quality Exists As A Condition Of Every Trademark License, And Exists In The Agreement Between The Parties .............................. 3

    C. Wiley Has Deprived DMEF Of Quality Control, Thereby Acting Outside The Scope Of Its License And Engaging In Unauthorized Use Of DMEF's Mark .................................................................................................... 5

    D. Wiley's Unauthorized Use Causes A Likelihood Of Confusion As To DMEF's Sponsorship And Approval Of Wiley's Intended Publication ................ 6

II. DMEF WILL SUFFER IRREPARABLE HARM AS A RESULT OF WILEY'S UNAUTHORIZED AND INFRINGING USE OF ITS MARK ........................ 7

    A. Loss Of Quality Control Suffices To Show Irreparable Harm ...................... 7

    B. The Publication Of The Winter/Spring 2008 "Best Of" Issue Will Negatively Affect The Reputation Of DMEF, The Goodwill Associated With The Journal Of Interactive Marketing Trademark, And The Rating Of The Journal .................................................................................................... 8

    C. Publication Of The Winter/Spring 2008 Issue Will Have A Negative Effect On The Journal Of Interactive Marketing's Impact Factor ........................ 9

    D. The Winter/Spring 2008 Issue Will Be Of Inferior Quality ...................... 10

    E. The Harm To DMEF Is Thus Immediate, Long-lasting, Immeasurable, And Irreparable .................................................................................................... 11

III. THE BALANCE OF HARDSHIPS FAVORS DMEF ................................ 11

    A. Wiley's Claimed Harm Arises From Wiley's Own Decision To Deprive DMEF Of Quality Control ................................................................ 11

    B. DMEF Faces Significant And Long-lasting Damage To Its Reputation And The Reputation, Goodwill, And Validity Of Its Trademark .................... 12

IV. CONCLUSION ................................................................................................ 13

## TABLE OF AUTHORITIES

Page(s)

### CASES

*Church of Scientology International v. Elmira Mission of the Church of Scientology,*
    794 F.2d 38 (2d Cir. 1986).................................................................................. 8

*Dawn Donut Co. v. Hart's Food Stores, Inc.,*
    267 F.2d 358 (2d Cir. 1959)...........................................................................2-3, 12

*Dolman v. U.S. Trust Co. of N.Y.,*
    2 N.Y.2d 110, 157 N.Y.S.2d 537 (1956)............................................................ 4

*El Greco Leather Products Co. v. Shoe World, Inc.,*
    806 F.2d 392 (2d Cir. 1986).............................................................................2, 3, 5

*Embedded Moments, Inc. v. International Silver Co.,*
    648 F. Supp. 187 (E.D.N.Y. 1986)..................................................................... 3, 5

*Franchised Stores of N.Y., Inc. v. Winter,*
    394 F.2d 664 (2d Cir. 1968)................................................................................ 7

*Home Box Office, Inc. v. Showtime/The Movie Channel Inc.,*
    832 F.2d 1311 (2d Cir. 1987) ............................................................................. 8

*Mastrobuono v. Shearson Lehman Hutton, Inc,*
    514 U.S. 52 (1995) .............................................................................................. 3

*Power Test Petroleum Distributors, Inc. v. Calcu Gas, Inc.,*
    754 F.2d 91 (2d Cir. 1985).................................................................................. 7, 8

*Warner-Lambert Co. v. Northside Development Co.,*
    86 F.3d 3 (2d Cir. 1996)...................................................................................... 5

*Westmoreland Coal Co. v. Entech, Inc.,*
    100 N.Y.2d 352, 763 N.Y.S.2d 525 (2003)........................................................ 3

*Zino Davidoff S.A. v. CVS Corp.,*
    No. 06-CV-15322 KMK, 2007 WL 1933932 (S.D.N.Y. July 2, 2007).............. 3, 6

### STATUTES

15 U.S.C. § 1055 ........................................................................................................ 2, 7

15 U.S.C. § 1127 ........................................................................................................ 2

28 U.S.C. § 1746 ........................................................................................................ 9

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

## MISCELLANEOUS

1 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 3:10 (4th ed. 2008) ..................................................................................................................... 2

3 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 18:42 (4th ed. 2008) ..................................................................................................................... 5

3 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 18:59 (4th ed. 2008) ..................................................................................................................... 3

4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 25:42 (4th ed. 2008) ..................................................................................................................... 3

DMEF's motion for a preliminary injunction is rooted in the core principles of trademark law that a trademark owner/licensor has the right, indeed the obligation, to *control* the quality of its licensee's products, and that a licensee's use of the mark inures to the benefit of the licensor without creating any independent rights in the licensee. Wiley has not offered a single argument to dispute that. Its failure to deal with those basic principles, which are read into every trademark license, will not make them go away.

Wiley does not dispute the parties' twenty-year course of conduct under the Agreement by which substantial, legitimate quality control procedures were established by DMEF's appointed editors and Editorial Review Board for the solicitation, review and approval of articles to be published under DMEF's JOURNAL OF INTERACTIVE MARKETING trademark. Wiley does not dispute that it has prevented DMEF from exercising control over the quality of the *Journal of Interactive Marketing* in 2008. Rather, Wiley asserts -- incorrectly -- that it has no obligation to allow DMEF such control and that its intended use of DMEF's trademark is authorized. Wiley's argument fails as a matter of trademark law.

Wiley argues that a single paragraph in the Agreement, taken out of context and silent on the issue of quality control, justifies its intended actions; that it intends to "disassociate" DMEF's trademark from DMEF; and that it, and not DMEF, will be irreparably harmed by the grant of a preliminary injunction, despite the fact that any harm it might experience would be self-inflicted. Stripped of those irrelevancies, Wiley is left with the stark, but extravagant, claim that its license from DMEF authorizes it to publish whatever it wants under DMEF's trademark before returning DMEF's then tarnished trademark to DMEF at a time when the two will be direct competitors. DMEF is confident that this Court will see through the ploy and grant DMEF its much needed injunction.

I.  **DMEF IS LIKELY TO SUCCEED ON THE MERITS BECAUSE WILEY'S INTENDED USE OF DMEF'S TRADEMARK CONSTITUTES UNAUTHORIZED AND THEREFORE INFRINGING USE AS A MATTER OF LAW**

The gravamen of DMEF's claim of infringement is that Wiley has deprived it of the right to control the quality of the products offered in connection with its registered trademark – a right that DMEF has *as a matter of law*. If the Court agrees, it must find that Wiley's use is unauthorized. If its use is unauthorized, Wiley is, by definition, an infringer and must be enjoined.[1]

A.  **DMEF Has The Right And The Obligation To Control The Quality Of Goods Offered In Connection With Its Trademark**

Wiley has not and cannot dispute that trademark owners have the right to *control* the quality of goods offered in connection with their marks. *El Greco Leather Prods. Co. v. Shoe World, Inc.*, 806 F.2d 392, 295 (2d Cir. 1986) ("One of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's trademark."). The Lanham Act both protects and requires a trademark owner's control over quality because trademarks indicate to the public that goods bearing the mark are of uniform quality and are subject to a single source of control. *See* DMEF's Initial Memorandum ("DMEF's Initial Mem."), p. 10-11. *See also* 15 U.S.C. §§ 1055, 1127; 1 J. Thomas McCarthy, McCarthy On Trademarks and Unfair Competition ("McCarthy") § 3:10 (4th ed. 2008). As stated in *Dawn Donut Co. v. Hart's Food Stores, Inc.*:

---

[1] Courts in the Second Circuit generally must consider the eight *Polaroid* factors, enumerated in DMEF's Initial Mem, p. 11, to determine the likelihood of confusion. That analysis is less applicable in cases involving non-genuine goods and/or unauthorized licensing, because use of identical marks on identical goods in those situations typically suffices to show confusion. Nonetheless, under a *Polaroid* analysis, all of the applicable factors favor DMEF (*i.e.*, similarity of mark, competitive proximity of product, defendant's good faith, quality of defendant's products, and sophistication of consumers), while the remainder are moot or neutral (strength of the mark, likelihood that plaintiff will bridge the gap, and actual confusion).

> [U]nless the licensor exercises supervision and control over the operations of its licensees the risk that the public will be unwittingly deceived will be increased and this is precisely what the [Lanham] Act is in part designed to prevent. Clearly, the only effective way to protect the public where a trademark is used by licensees is to place on the licensor the affirmative duty of policing in a reasonable manner the activities of his licensees.

267 F.2d 358, 367 (2d Cir. 1959) (internal citation omitted). If a trademark licensee deprives the licensor of that control, infringement occurs even where the goods in question are not of lesser quality, because it is the trademark owner's ability to *control* the quality – and its reputation – that is paramount. *See El Greco*, 806 F.2d at 395; *Zino Davidoff S.A. v. CVS Corp.*, No. 06-CV-15322 KMK, 2007 WL 1933932, at *3 (S.D.N.Y. July 2, 2007) (J. Karas); 4 McCarthy § 25:42.

### B. The Right To Control Quality Exists As A Condition Of Every Trademark License, And Exists In The Agreement Between The Parties

The right to control quality arises from trademark law, and need not be expressly provided in a license agreement. *Embedded Moments, Inc. v. Int'l Silver Co.*, 648 F. Supp. 187, 193-94 (E.D.N.Y. 1986) ("It is not necessary ... for the licenses themselves to contain a written provision for control"); *Dawn Donut*, 267 F.2d at 368; 3 McCarthy § 18:59. In this case, the parties' Agreement *does* establish DMEF's right to quality control.

Wiley urges a counterintuitive reading of the Agreement by asking this Court to read one paragraph as though it stands alone. Courts, however, do not read the provisions of a contract in isolation; rather, they read and interpret the contract as a whole. *Westmoreland Coal Co. v. Entech, Inc.*, 100 N.Y.2d 352, 358, 763 N.Y.S.2d 525, 528 (2003) (contracts are read as a whole and each part is interpreted with reference to the whole). Paragraph 16, regarding non-renewal, is a part of the Agreement and should not be read as separate from it. In addition, Wiley drafted the Agreement. To the extent that there is any ambiguity, the Court must construe the contract in DMEF's favor. *Mastrobuono v. Shearson Lehman Hutton, Inc*, 514 U.S. 52, 62 (1995) ("a court should construe ambiguous language against the interest of the party that drafted it").

- 3 -

The Agreement clearly establishes DMEF's and its appointed editors' and the Editorial Review Board's control over quality of content. Compl., Ex. B, ¶ 4. Unlike many other provisions, the editorial control and responsibilities described in Paragraph 4 are not limited to the term of the Agreement. *Id.* The Court should give effect to that distinction. Under basic rules of contract interpretation, DMEF's control over content survives beyond the term and continues for the full period governed by the Agreement, including the one-year license following non-renewal.

Paragraph 16, which Wiley would have the Court read as separate from the rest of the Agreement, is silent as to editorial control. *Id.*, ¶ 16. Read in context, it cannot mean what Wiley suggests: that such silence allows Wiley to dispense with all of the editorial practices and controls contained in the Agreement, and by which the parties intended to, and did, publish for many years. That interpretation requires complete suspension of logic. It defies common sense to infer that the parties intended for DMEF to control the content to be published under its trademark while in a mutually beneficial relationship, only to relinquish all control upon non-renewal -- giving Wiley unfettered discretion with respect to DMEF's trademark in the year that Wiley would be establishing itself as DMEF's competitor -- and yet to retain DMEF's right to use its (potentially tarnished) trademark in subsequent years. Beyond straining credulity, such hypothetical intent cannot be presumed in light of the law governing trademark licenses, which, as noted above, requires a trademark owner to exercise quality control of the products offered under its mark.

Even if read standing alone as Wiley urges, Paragraph 16 does not support Wiley's position. The parties agree that Paragraph 16 grants Wiley a one-year trademark license. Contracts are interpreted to incorporate then-existing law. *Dolman v. U.S. Trust Co. of N.Y.*, 2 N.Y.2d 110, 116, 157 N.Y.S.2d 537, 541-42 (1956) ("the law in force at the time the agreement is entered into becomes as much a part of the agreement as though it were expressed or referred to therein"). Although the paragraph is silent as to control, by operation of law every license inherently includes

the trademark owner's right to control quality, whether or not that right is expressly stated. *Embedded Moments,* 648 F. Supp. at 193-94.

Contrary to Wiley's implication, DMEF has not asked the Court to rescind or modify the contract, nor does DMEF seek to change the scope and terms of the license. DMEF agrees with Wiley that "the terms of the Agreement should continue to govern the relationship between Wiley and DMEF." Whether read in context or in isolation subject to legally-imposed trademark principles, Paragraph 16 preserves DMEF's right to control the quality of the product offered under DMEF's mark. Wiley has no legal basis for denying DMEF that right.

### C. Wiley Has Deprived DMEF Of Quality Control, Thereby Acting Outside The Scope Of Its License And Engaging In Unauthorized Use Of DMEF's Mark

Goods that have not been subject to the trademark owner's quality control are not "genuine" for the purposes of the Lanham Act, and therefore are unauthorized. *El Greco,* 806 F.2d at 395-96; *Warner-Lambert Co. v. Northside Dev. Co.,* 86 F.3d 3, 6-7 (2d Cir. 1996); 3 McCarthy § 18:42. Parties who are otherwise licensed to use a trademark can exceed the scope of permission and engage in unauthorized use in myriad ways, including by using the mark beyond the temporal and geographic limits of the license, or by depriving the trademark owner of its rightful control over quality. Despite Wiley's effort to distinguish the cases cited in DMEF's Initial Mem., in each of them the court found that a party had infringed, despite "express authorization" to use the mark, because the objectionable use exceeded the authorization in terms of time, place, or control. If a licensee uses a trademark on goods that are not "genuine," it engages in unauthorized use to no less a degree than if it uses a trademark outside the permitted geographical area or after the license expires. As this court recently reaffirmed, "[g]oods … that do not meet the trademark owner's quality control standards will not be considered genuine goods, and their sale will constitute trademark infringement." *Zino Davidoff,* 2007 WL 1933932, at *2-3 (internal quotations omitted).

Wiley's argument that its intended "Best Of" issue will contain re-prints of articles previously approved by DMEF is irrelevant. DMEF's quality control standards require the involvement of DMEF-appointed editors and the Editorial Review Board in selecting content for each issue of the Journal. Compl., Ex. B, ¶ 4; Declaration of Russell Winer dated February 11, 2008 ("Winer Decl."), ¶¶ 3, 6, 7. That selection process considers both the individual articles and the issue as a whole. *Id.*, at ¶ 6. Because the collection of articles has not been subject to DMEF's editorially-driven process of quality control, Wiley's "Best Of" issue is not a genuine product under the Lanham Act, and its publication would constitute trademark infringement. *Zino Davidoff*, 2007 WL 1933932, at *2-3.

### D. Wiley's Unauthorized Use Causes A Likelihood Of Confusion As To DMEF's Sponsorship And Approval Of Wiley's Intended Publication

Academic journals are unique. They are not trade journals or magazines. Consumers of academic journals expect that the content has been reviewed and selected by a knowledgeable editorial staff. For twenty years, the *Journal of Interactive Marketing* has been published under the quality standards established by DMEF and implemented through its selection and appointment of editors and the Editorial Review Board. By publishing an issue of the Journal without submitting it to those controls, Wiley will create the misimpression that the same quality standards have been applied and that the issue received the approval and sponsorship of DMEF, its editors and the Editorial Review Board.

Contrary to Wiley's suggestion, the notification that Wiley intends to print on the Journal will *not* alleviate confusion as to the source or sponsorship, and does *not* disassociate Wiley's publication from DMEF or signify a break from publishing the Journal in conjunction with DMEF. Wiley's Mem. at p. 8-9, 10-11. As a pure matter of law, it cannot. Wiley's only right to use JOURNAL OF INTERACTIVE MARKETING arises from its license. Use under a license agreement accrues to the benefit of the licensor. 15 U.S.C. § 1055; *Franchised Stores of N.Y., Inc. v.*

*Winter*, 394 F.2d 664, 668 (2d Cir. 1968). A licensee cannot use the trademark and at the same time disavow affiliation with the trademark licensor. Wiley's intended use of DMEF's trademark on the Journal necessarily implies sponsorship or approval of DMEF as the trademark owner and licensor. *See, e.g., Power Test Petroleum Distribs., Inc. v. Calcu Gas, Inc.*, 754 F.2d 91, 98 (2d Cir. 1985) (the essence of the trademark is that the owner controls its own product).

Wiley mistakenly states that "[d]isclaimers, such [as] the one to be printed on the cover of the Winter/Spring 2008 issue of the Journal, are a favored way of alleviating consumer confusion as to the source or sponsorship." The notification required by the Agreement is not a "disclaimer" in the sense that Wiley implies. The notification signifies the status of the Journal, not the relationship between the parties, during the one-year transition. It merely tells the public that the Journal is not the official journal of DMEF. It does not disclaim that it is a journal published, endorsed, or sponsored by DMEF. None of the cases cited by Wiley involves a license relationship, because no disclaimer can truthfully state that a licensee is not affiliated with a licensor.[2]

## II. DMEF WILL SUFFER IRREPARABLE HARM AS A RESULT OF WILEY'S UNAUTHORIZED AND INFRINGING USE OF ITS MARK

### A. Loss Of Quality Control Suffices To Show Irreparable Harm

Under controlling authority of this circuit, depriving a trademark owner of control over the reputation of its mark constitutes irreparable harm. *Power Test Petroleum Distribs.*, 754 F.2d 91; *see also Church of Scientology Int'l v. Elmira Mission of the Church of Scientology*, 794 F.2d 38, 43-44 (2d Cir. 1986). In addition, because Wiley's use in the absence of DMEF's quality control is *not* authorized, it constitutes infringement and, on that basis, DMEF's irreparable harm is established or

---

[2] The actual design of the "notification" is likely to *exacerbate* confusion as to source or sponsorship, rather than to alleviate it. As displayed in the declaration of Sue Lewis, dated February 20, 2008 ("Lewis Decl."), Ex. 3, the notification will include DMEF's name in larger, more visible type than the rest of the text, and the line breaks are such that they tend to emphasize "The Official Journal of the Direct Marketing Educational Foundation."

at least presumed. *Home Box Office, Inc. v. Showtime/The Movie Channel Inc.*, 832 F.2d 1311, 1314 (2d Cir. 1987) (quoting *Standard & Poor's Corp. v. Commodity Exchange, Inc.*, 683 F.2d 704, 708 (2d Cir. 1982)).

### B. The Publication Of The Winter/Spring 2008 "Best Of" Issue Will Negatively Affect The Reputation Of DMEF, The Goodwill Associated With The *Journal Of Interactive Marketing* Trademark, And The Rating Of The Journal

Wiley's 2008 "Best Of" issue will be a compilation of ten previously published articles, selected primarily according to "usage." Lewis Decl., ¶¶ 10, 13-15. In stark contrast, the 1997 "Best Of" issue was the *final issue* of the *Journal of Direct Marketing*, and was developed by the Journal's editors – which is consistent with quality control standards established by DMEF and with the expectation of its readers. Winer Decl., ¶7; Lewis Decl., ¶ 16, Ex. 2. The 1997 issue reflected the editors' considered and collective judgment that the articles represented the "best" of what the Journal had previously published and "would be fitting" to publish as a retrospective of articles that had helped "set the standards by which future articles would be evaluated." Because it was to be the last issue under the old name, the scholars on the Editorial Review Board believed the selected articles "taken as a group" would allow readers "to observe where we have been and to reflect on how much the field of direct marketing has evolved . . . as the industry moved into 'the age of interactivity'" (which provided the rationale for the Journal's name change). By Wiley's own admission, Wiley's process involved a purely mechanical selection based on computer download and viewing statistics.[3] Lewis Decl., ¶ 13.

---

[3] Wiley attempts to cast its process as "much more reliable and formal" than the process used by DMEF for the 1997 "Best Of" issue. However, what Wiley calls the "less formal method of polling their Editorial Board," DMEF calls "editorial judgment" and "quality control." It reflects the expertise and knowledge of the editors, and is what readers expect in a high-quality academic journal.

Those familiar with the *Journal Of Interactive Marketing* will assume that the content of the Journal reflects the judgment of the Editorial Review Board and editors. Not only will they be under a misapprehension as to source, sponsorship, and approval, they will see that the Journal contains no new content, that it contains only ten articles despite being billed as a double issue, and that it reflects little if any editorial expertise. The reputational damage will affect subscribers' perception and authors' interest in submitting manuscripts. Both will have a lasting impact on the goodwill associated with DMEF's trademark. Moreover, DMEF does not know and -- absent an injunction -- cannot control Wiley's plans for publishing other problematic content under the JOURNAL OF INTERACTIVE MARKETING for the remainder of the year. Without an injunction, Wiley could choose to publish a subsequent "Best Of" issue, or even a "Worst Of" issue, causing even greater harm to DMEF's reputation and the goodwill associated with the mark.

### C. Publication Of The Winter/Spring 2008 Issue Will Have A Negative Effect On The *Journal Of Interactive Marketing*'s Impact Factor

The declaration of Iain Craig's dated February 20, 2008 ("Craig Decl.") is based on speculation and Mr. Craig's personal opinion regarding how Thomson Scientific is likely to account for Wiley's "Best Of" issue.[4] Mr. Craig does not definitively state, as Wiley claims he does, that publication of the "Best Of" issue "will have no effect on the impact factor." Wiley Mem., p. 13-14. Rather, he states that "there *should be* no net effect on the impact factor," if the staff at Thomson follows the general principles and exceptions as Mr. Craig believes they should. Craig Decl., ¶¶ 5-7.

However, assuming *arguendo*, that Mr. Craig is correct, Wiley's publication of the "Best Of" issue would undoubtedly have a negative effect on the impact factor in the future. In 2010, by which time Wiley will be well-insulated from any harm, based on Mr. Craig's assumptions,

---

[4] DMEF notes that Mr. Craig's declaration does not comply with 28 U.S.C. § 1746, requiring an unsworn declaration executed outside the United States to include a provision that the declarant's statement is made under penalty of perjury *under the laws of the United States of America*.

the impact factor will not be calculated based on 2008 and 2009 as it ordinarily would be. Instead, the 2010 impact factor will be calculated solely based on the number of citations to articles published in 2009 divided by the total number of articles published in 2009. However, due to the cycle for manuscript submission, selection, and publishing, it is highly unlikely that many articles published in 2010 will have had the opportunity to cite to articles published in 2009. It appears that Thomson Scientific uses a two-year rolling basis to account for just such lag times in article citations. Where nothing is published in the first of the two year period (here, 2008), the numerator will be artificially low because not enough time has elapsed to allow citations to articles published in the second year of the two-year period (2009). Thus, a full two years from now, DMEF still would feel the adverse effect of Wiley's actions. The impact factor also will suffer from the general damage to the reputation of the Journal, which will make it more difficult to attract leading scholarship that is likely to draw citations. The damage to DMEF due to the effect on the impact factor is neither speculative nor neutral in the years ahead.

### D. The Winter/Spring 2008 Issue Will Be Of Inferior Quality

Although it is the *control* over quality and not the actual quality that is at issue, the damage to DMEF is exacerbated by the fact that Wiley's intended Winter/Spring 2008 issue will be inferior to what would be published under the quality control processes established and implemented by DMEF and its editorial board. A "Best Of" issue is inherently inferior to issues containing new relevant research and scholarship. More importantly, the Editorial Review Board currently has original manuscripts that have been vetted, that are ready for publication, and that previously have been offered to Wiley by DMEF for publication in 2008.

Wiley claims to have substantial experience in journal publishing. Lewis Decl., ¶ 18. DMEF does not dispute that Wiley is an experienced and accomplished *publisher*. It is not, however, an experienced and accomplished *editor*. Nothing in Wiley's response is to the contrary.

### E. The Harm To DMEF Is Thus Immediate, Long-lasting, Immeasurable, And Irreparable

The Court is respectfully referred to the above arguments and the declarations accompanying DMEF's Initial Mem. regarding the harm to DMEF absent an injunction.

## III. THE BALANCE OF HARDSHIPS FAVORS DMEF

Even if the Court were to find that DMEF is not likely to succeed on the merits of its infringement claim, it should grant a preliminary injunction if there are sufficiently serious questions going to the merits to make them fair ground for litigation, with the balance of hardships tipping decidedly in DMEF's favor. In this case, the balance of hardships tips clearly to DMEF.

### A. Wiley's Claimed Harm Arises From Wiley's Own Decision To Deprive DMEF Of Quality Control

Wiley's claims regarding the hardships it would suffer if the court were to grant DMEF's motion for preliminary injunction are unsupported. Wiley offers no substantiation for the asserted $120,000 that it claims it will lose in prepaid subscriber revenues. Id., ¶ 20. Regardless, those damages are quantifiable, not irreparable, and are not proper considerations when deciding a motion for a preliminary injunction. Second, Wiley does not explain why renewals would be lost indefinitely, or why such lost revenues cannot be quantified. Lewis Decl., ¶ 20. Third, Wiley claims that it would suffer damage to its reputation "as a reliable provider of content in a timely manner with individual and institutional subscribers" and "as a reliable publisher with potential society and academic partners." To the extent that Wiley faces potential reputational damage, it is of its own making. DMEF attempted to exercise the quality control that it is entitled to under the law, and offered to provide Wiley with approved content to publish during 2008. Wiley did not avail itself of DMEF's offers, instead choosing to deprive DMEF of its legal right to control quality. Wiley refused and should not be heard to complain now that it has placed itself in a difficult position.

When balancing between an innocent plaintiff and a defendant that created the situation, the court must find that the hardships tip in favor of the innocent plaintiff.

### B. DMEF Faces Significant And Long-lasting Damage To Its Reputation And The Reputation, Goodwill, And Validity Of Its Trademark

If Wiley is permitted to publish its "Best Of" issue under DMEF's trademark, DMEF will suffer immediate reputational damage. That reputational harm will have a cascading long-lasting effect on the reputation and goodwill associated with its mark. In addition, if the Court does not grant the injunction, Wiley will have the right to publish anything it wishes in connection with DMEF's trademark for the remainder of 2008. Furthermore, if DMEF is deprived of the right to control the quality of goods associated with its trademark, its mark could be exposed to claims of cancellation or abandonment before the Trademark Office. *Dawn Donut Co.*, 267 F.2d at 366. A trademark owner who does not exercise control over its mark may be found to have abandoned the mark. Taken to its logical conclusion, therefore, Wiley's inequitable conduct could cause DMEF to lose its trademark rights. The potential hardships to DMEF greatly outweigh any possible hardship to Wiley, much of which is speculative, and all of which Wiley had the ability to avoid or mitigate.

## IV. CONCLUSION

For the foregoing reasons, DMEF's motion for a preliminary injunction should be granted.[5]

Dated:   New York, NY
         February 25, 2008                    Respectfully Submitted,

                                              PAUL, HASTINGS, JANOFSKY & WALKER, LLP

                                              _____
                                              By:  Robert L. Sherman (RS 5520)

                                              75 East 55th Street
                                              New York, NY 10022
                                              (212) 318-6000 (telephone)
                                              (212) 318-6847 (facsimile)

                                              Attorneys for Plaintiff
                                              Direct Marketing Educational Foundation, Inc.

---

[5] DMEF express its gratitude to the Court for granting it permission to exceed the ten-page limit.

- 13 -

LEGAL_US_E # 78394600.6

PAUL, HASTINGS, JANOFSKY & WALKER LLP
Robert L. Sherman (RS 5520)
75 East 55th Street
New York, NY 10022
Telephone: (212) 318-6000
Facsimile: (212) 318-6847

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DIRECT MARKETING EDUCATIONAL FOUNDATION, INC.<br><br>       Plaintiff,<br><br>  - against -<br><br>JOHN WILEY & SONS, INC.,<br><br>       Defendant. | **CERTIFICATE OF SERVICE** |

  I hereby certify that the foregoing Reply Memorandum in Support of Motion for a Preliminary Injunction was served this 25th day of February, 2008, by delivering a true and correct copy of same by e-mail by agreement on Ashima Aggarwal at aaggarwa@wiley.com.

                       _/s/ Robert L. Sherman_
                       Robert L. Sherman